*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0345p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROSELLA HUNT,

        *Plaintiff-Appellant,*

    *v.*

SYCAMORE COMMUNITY SCHOOL DISTRICT BOARD
OF EDUCATION, et al.,

        *Defendants-Appellees.*

No. 07-4082

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 04-00769—Susan J. Dlott, District Judge.

Argued: June 12, 2008

Decided and Filed: September 11, 2008

Before: MARTIN, GRIFFIN, and GIBSON, Circuit Judges.[*]

---

## COUNSEL

**ARGUED:** Marc D. Mezibov, LAW OFFICE OF MARC MEZIBOV, Cincinnati, Ohio, for
Appellant. R. Gary Winters, McCASLIN, IMBUS & McCASLIN, Cincinnati, Ohio, for Appellees.
**ON BRIEF:** Marc D. Mezibov, Stacy A. Hinners, LAW OFFICE OF MARC MEZIBOV,
Cincinnati, Ohio, for Appellant. R. Gary Winters, Ian R. Smith, McCASLIN, IMBUS &
McCASLIN, Cincinnati, Ohio, for Appellees.

---

## OPINION

---

    JOHN R. GIBSON, Circuit Judge. Rosella Hunt appeals from the district court's entry of
summary judgment against her on her 42 U.S.C. § 1983 claim against the Board of Education of the
school district that employed her and the superintendent of that school district, Dr. Karen Mantia,
alleging that the defendants violated her right to substantive due process by subjecting her to
dangerous working conditions in her job as a teacher's aide for special education students. On an
extra-curricular field trip to a bowling alley, an autistic girl, A--, assaulted Hunt, rupturing disks in
her neck. The district court granted summary judgment to the defendants, concluding that there was

---

[*] The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit,
sitting by designation.

no affirmative action by the school district that endangered Hunt.  We affirm the judgment of the district court.

## I. Facts.

On review of a grant of summary judgment, we take the facts in the light most favorable to Hunt.

Hunt was hired in 1999 as an "educational assistant," or teacher's aide, helping with special education children in the Sycamore Community School District.  In her first year, she was injured when an autistic child attacked her and she fell to the ground, cracking her elbow.

In 2002, Hunt was assigned to work in the classroom where A-- was an eighth-grader.  A-- is autistic. At that time A-- was 5'8" and weighed over 150 pounds.  She had a history of assaultive behavior, as shown by the incident reports appearing in the record.  There is a dispute about how many reports there are, but the school district contends the number is thirty-one, up to and including the date of Hunt's injury.  These reports show numerous injuries to the people taking care of A--, including injuries caused by biting, kicking, hitting, and scratching.  The reports extend from March 1999 through December 2002, and they indicate that at least some of the people taking care of A-- were frustrated with the situation.  For instance, one victim answered the incident form's question: "What is being done to prevent this type of incident from happening in the future?"  A: "Nothing that I can see.  This behavior of ___ just goes on & on."

The record indicates that the school district had a system for information on such incidents to be collected and ultimately addressed through a disabled child's Individualized Education Program and a behavioral intervention plan.  Indeed, the district initiated a behavioral intervention plan for A-- in November 2002.

In the 2000-01 school year, before being assigned to A–'s classroom, Hunt heard from two aides and a bus driver that A-- hit, kicked, and bit other students and staff and had injured an aide.  During the 2002-03 school year, Hunt saw A-- bite and hit Priscilla Masters, her teacher, and two aides.  A-- was such a problem on the school bus that the junior high school assistant principal hired Hunt to ride the bus with her to keep her from hurting other people and to make her get off the bus when they got to school.  Hunt received extra pay for that assignment.  On October 7, 2002, while riding the bus, A-- hit Hunt in the back and bit her hand.

On December 2, 2002, there was an extra-curricular field trip of the "Partners Club" at a bowling alley.  The Partners Club paired special education students with other children for social activities.  Hunt volunteered to help at Partners Club events and received extra pay for doing so.  She and A-- had been at the bowling alley with the Partners Club before.  On this occasion, there were two teachers and two aides along to supervise.  When A-- ventured into another bowling lane and began trying to hit a child from another school, Hunt went to intervene.  A-- hit her in the chest and pulled a lanyard around Hunt's neck, choking her.  Hunt heard her neck pop.  Hunt was injured and has been diagnosed with two herniated disks in her neck.

Hunt sued the Sycamore Community School District Board of Education, its superintendent, Dr. Karen Mantia, and A--'s parents for violation of her federal rights under 42 U.S.C. § 1983 and for negligence.  Her section 1983 claim was for violation of her right "to personal security and bodily integrity by failing to provide or maintain a workplace that was free of foreseeable and unreasonable risks of physical harm."  She alleged that the school district and Dr. Mantia knew that the injury she sustained was substantially certain to result from the way the school district had chosen to handle A--.  The school district and the superintendent moved for summary judgment.

The district court examined whether the school district could be liable under § 1983 based on the state-created danger doctrine. The district court held that there was no state-created danger in this case for two reasons: (1) "The mere act of permitting [A--] to attend (or not prohibiting her attendance at) the extracurricular event is not an affirmative act that can support a state-created danger claim," and (2) "Hunt attended the after-school bowling alley event voluntarily despite knowing that [A--] had attended past Partners Club bowling events and despite knowing firsthand about [A--'s] physically aggressive behavior in other situations." The district court specifically declined to decide the questions of the schools district's liability under *Monell*[1] and the school superintendent's supervisory liability because it held there was no underlying constitutional violation.

The district court entered summary judgment for the school district and the superintendent. Hunt then settled the case against A–'s parents, which was dismissed with prejudice. She now appeals from the final judgment against her.

The standard of review for summary judgment is de novo. *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 490 (6th Cir. 2002). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Id.*

## II. Substantive Due Process and the State-Created Danger Doctrine.

To establish a cause of action under § 1983, Hunt must marshal evidence that could establish two elements: (1) deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law. *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 463 (6th Cir. 2006). The right Hunt contends was violated was her right to substantive due process. In a § 1983 claim predicated on a due process violation, there is a certain redundancy in the two elements; both require a link between the injury and the government, since the due process clause is not violated by purely private wrongs. *See DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).

Hunt contends the school district actors violated her due process rights by providing and maintaining a workplace in which A-- was likely to and did in fact injure her. "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* A governmental actor may, however, violate the due process clause by allowing a third party to harm a person in government custody, *see id.* at 200; *Stemler v. City of Florence*, 126 F.3d 856, 868 (6th Cir. 1997), or by creating a particular danger to the victim. This latter theory of liability, which the Supreme Court adverted to, but did not espouse, in *DeShaney*, *see* 489 U.S. at 201, has been recognized in this Circuit as a viable species of substantive due process claim. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1065-67 (6th Cir. 1998). Under the "state-created danger doctrine," a governmental actor can be held responsible for an injury committed by a private person if

(1) an affirmative act by the governmental actor either created or increased the risk that the plaintiff would be exposed to the injurious conduct of the private person;

(2) the governmental actor's act especially endangered the plaintiff or a small class of which the plaintiff was a member; and

(3) the governmental actor had the requisite degree of culpability.

*McQueen*, 433 F.3d at 464.

---

[1] *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

Of these three elements, we will focus on the question of culpability.[2] In *McQueen*, the court explicitly stated that the level of culpability for the state-created danger doctrine is that level that would suffice to establish a substantive due process violation. *Id.* at 469.

### III.  Substantive Due Process Culpability.

The leading case on the standard of culpability in substantive due process cases based on executive action is *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).  In *Lewis*, the Supreme Court considered whether the personal representatives of a boy who was killed in a high-speed car chase established a claim for a substantive due process violation against a sheriff's deputy and others by alleging that the deputy caused the boy's death through deliberate indifference or reckless disregard for the boy's life.  Justice Souter's discussion defined the issue as a question of whether the executive action of engaging in the car chase was "arbitrary":

> Since the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary action . . . .  We have emphasized time and again that "[t]he touchstone of due process is protection of the individual against arbitrary action of government," whether the fault lies in a denial of fundamental procedural fairness or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective . . . .
> Our cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be "arbitrary in the constitutional sense . . . ."

523 U.S. at 845-46 (citations omitted).

Justice Souter then said that "the cognizable level of executive abuse of power" is conduct that "shocks the conscience." *Id.* at 846.  The conscience is not always shocked by the same level of culpability, however, so we cannot equate the standard with any "traditional category of common-law fault," such as intent or negligence. *Id.* at 848.  We can say that mere negligence is definitely not enough and that conduct "intended to injure in some way unjustifiable by any governmental interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 834.  But the middle states of culpability, such as recklessness, gross negligence, or deliberate indifference, may or may not be shocking depending on context. *Id.* at 849-50.  "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* at 850.

The circumstances the Supreme Court found determinative in *Lewis* were that the situation "call[ed] for fast action" and the deputy had "obligations that tend[ed] to tug against each other," specifically, the duty to restore and maintain lawful order, on the one hand, versus the duty to avoid creating danger by engaging in a chase. *Id.* at 853.  The Supreme Court declined to make the governmental actor's choice between legitimate obligations into a constitutional issue. Ultimately, the Supreme Court held that even if the deputy was alleged to have acted with deliberate or reckless indifference, the complaint did not allege a substantive due process claim because it did not allege that he had acted from any motivation other than a legitimate law enforcement purpose of apprehending a suspect. *Id.* at 855.  "Accordingly, we hold that high-speed chases with no intent

---

[2] The district court did not reach the question of culpability, but we consider it to be the clearest basis for affirming.  We may affirm on any ground supported by the record. *In re Cleveland Tankers, Inc.*, 67 F.3d 1200, 1205 (6th Cir. 1995).

to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Id.* at 853.

As we shall explain below, when executive action is worse than negligent but was not done for the purpose of injuring someone or in furtherance of invidious discrimination, *see Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448, 453 (6th Cir. 2002), *Lewis* and later cases interpreting it have identified several considerations that bear on whether the action will be considered arbitrary, including: (1) the voluntariness of the relationship between the government and the plaintiff, especially whether the plaintiff was involuntarily in government custody or was voluntarily a government employee; (2) whether the executive actor was required to act in haste or had time for deliberation; and (3) whether the government actor was pursuing a legitimate governmental purpose.

**(a) Voluntariness of Plaintiff's relationship with government actor and assumption of risk.**

*Lewis* recognized that cases in which the plaintiff is in government custody present a demanding standard of behavior for governmental actors. Where the victim is in government custody, deliberate indifference to that person's medical needs is conscience-shocking. 523 U.S. at 850. The victim's dependence on the state, his inability to provide for his own needs, and the involuntariness of his situation require the government to take care of the prisoner. *Id.* at 851-52; *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). We applied this concept of custody to a case in which the victim was not literally a prisoner, but was incapacitated by intoxication when the police physically picked her up and put her in the truck with a drunk and abusive man, which led to her death. *Stemler v. City of Florence*, 126 F.3d 856, 868-70 (6th Cir. 1997). Even without proof that the police intended to hurt the victim, their deliberate indifference to the known risk established the necessary culpability for a substantive due process claim.

On the other hand, cases in which the plaintiff is a government employee suing for injuries received in the line of duty present the opposite situation in terms of voluntariness of the relation; therefore, such claims are particularly unlikely to succeed. *See generally Witkowski v. Milwaukee County*, 480 F.3d 511, 512 (7th Cir. 2007) ("[N]o decision in [the Seventh] circuit (or in any circuit after *Collins [v. Harker Heights*, 503 U.S. 115 (1992)]) has awarded damages under § 1983 to a public employee injured in the line of duty . . . .").

The leading case concerning government employees is *Collins v. Harker Heights*, 503 U.S. 115 (1992), in which a city allegedly failed to train its employees or provide them with equipment necessary for entering sewer lines, and an employee died of asphyxia after entering a manhole to unstop a sewer line. The Fifth Circuit denied liability, relying on the fact that the plaintiff's decedent was a government employee, but the Supreme Court said, "The employment relationship, however, is not of controlling significance," because the city could have committed a due process violation if it had, for instance, given an employee a dangerous assignment to punish him for exercising his First Amendment rights. *Id.* at 119. However, failure to provide the plaintiff's decedent a safe working environment was not something due process protected against:

> Petitioner's submission that the city violated a federal constitutional obligation to provide its employees with certain minimal levels of safety and security is unprecedented. It is quite different from the constitutional claim advanced by plaintiffs in several of our prior cases who argued that the State owes a duty to take care of those who have already been deprived of their liberty.

*Id.* at 127. Failure to provide a safe working environment is not "conscience-shocking, in a constitutional sense," *id.* at 128, because it is not "arbitrary." The Court concluded:

> Our refusal to characterize the city's alleged omission in this case as arbitrary in a constitutional sense rests on the presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces. *Cf. Walker v. Rowe*, 791 F.2d 507, 510 (7th Cir. 1986). Decisions concerning the allocation of resources to individual programs, such as sewer maintenance, and to particular aspects of those programs, such as the training and compensation of employees, involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country.

*Id.* at 128-29.

While it has not proved impossible for government employees to establish arbitrariness of their employer, such claims have, for the most part, not succeeded in this Circuit. In a state-created danger case in which public employees prevailed against their employer, we determined that police had a due process claim against the City for endangering them by releasing information that would make it easier for third persons to harm them. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998). In contrast, in other cases in which the harm to a government employee was inflicted by third persons, we have held that there was no state-created danger. In *Nobles v. Brown*, 985 F.2d 235 (6th Cir. 1992), we held that a government employee could not recover when hurt by a third person in the line of duty. In *Nobles*, a prison guard was taken captive and raped by a prisoner. We noted that the defendant officials were "charged with having played a part in creating the dangers faced by the plaintiff," and so *Nobles* was distinguishable from *DeShaney*. *Id.* at 237. Nevertheless, the court held that the guard's rights had not been violated because it was not the government officials, but a prisoner who raped the guard. *Id.* at 238. We quoted *Walker v. Rowe*, 791 F.2d 507, 511 n.2 (7th Cir. 1986), which said that "even deliberate exposure of public employees to high risk does not violate the constitution because it is not an abuse of government power." *Nobles*, 985 F.2d at 238 (internal quotation marks omitted). *Accord Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 494 (6th Cir. 2002); *see also Hayes v. Vessey*, 777 F.2d 1149, 1152 (6th Cir. 1985) (claim by prison teacher against prison officials based on rape by inmate failed for lack of "intentional governmental act").

A case from outside the state-created-danger doctrine shows that a government agency's provision of an unsafe workplace to its employees is particularly unlikely to shock the conscience. In *Upsher v. Grosse Pointe Public School System*, 285 F.3d 448, 450 (6th Cir. 2002), after a contractor refused to rip up carpet from asbestos tile because of the danger from the asbestos, a school district decided to use its custodians to do the work instead, with virtually no safety precautions. "[T]he plaintiffs chiseled, chipped, pounded, pulverized, hammered, and jack hammered the tiles . . . ." *Id.* at 450. The custodians were massively exposed to friable asbestos and sued the school district under § 1983 for substantive due process violations. We upheld summary judgment for the school district, stating a very stringent culpability standard:

> This court made clear in *Lewellen v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 34 F.3d 345 (6th Cir. 1994),[3] that in a non-custodial setting,

---

[3] In *Lewellen v. Metropolitan Government of Nashville and Davidson County*, 34 F.3d 345, 346-47 (6th Cir. 1994), a school district refused to shut down its electricity to allow power lines to be moved before construction work began, despite its knowledge that the line needed to be moved for safety reasons. The school board refused to allow electricity to be shut down for a few hours while school was in session or to pay $600 to $1000 to have the line moved on a weekend, and everyone involved agreed that the line needed to be moved before the construction work was done. The work went on with the lines in place, and the plaintiff worker was electrocuted in an accident. The defendants "acted intentionally in delaying the planned move of the power line," *id.* at 351, but they did not hurt the plaintiff on purpose, and this court therefore held that the plaintiffs could not establish a substantive due process claim. *Id.* We foreshadowed *Lewis* in observing, "What seems to be required is an intentional infliction of injury . . . or some other

> in order to establish liability for violations of substantive due process under § 1983, a plaintiff must prove that the governmental actor either intentionally injured the plaintiff or acted arbitrarily in the constitutional sense. The *Lewellen* court expressed doubt as to whether, in a non-custodial case, "deliberate indifference" could give rise to a violation of substantive due process. We point this out because the district court, in ruling on the defendants' initial motion for partial summary judgment, stated that "[t]he 1983 claim . . . could possibly go forward as a case of deliberate indifference." We believe the more exact standard, announced in *Lewellen*, is that *in order to succeed on a § 1983 claim in a non-custodial setting, a plaintiff must prove either intentional injury or* "arbitrary conduct intentionally designed to punish someone–e.g., giving a worker a particularly dangerous assignment in retaliation for a political speech . . . or because of his or her gender." Or, as stated in *Stemler*, [126 F.3d at 869], a plaintiff must prove "conscience shocking" behavior.

285 F.3d at 453 (emphasis added and citations and some internal punctuation omitted). Thus, the distinction between custodial settings and voluntary relationships such as employment was considered to be the determinative factor in setting the culpability level for a substantive due process claim.

Although not discussed explicitly in *Upsher*, the concept of assumption of risk is relevant in the public employee cases where the employee was hired to perform an inherently dangerous job. Assumption of risk is closely akin to the voluntariness factor that distinguishes governmental action towards persons in custody from governmental action vis-à-vis government employees. In *Walker v. Rowe*, 791 F.2d at 510, a case the Supreme Court cited in *Collins*, 503 U.S. at 128, and we cited in *Nobles*, 985 F.2d at 237-38, Judge Easterbrook relied on the fact that guards signed on for a dangerous job:

> The state may not dragoon people to be guards. Would-be guards, represented by their labor unions, may decide to accept a little less safety in exchange for a little higher pay. Having decided that the combination of pay, benefits, and safety is satisfactory, the guards cannot turn around and say that the constitution required that safety be a larger component of the total package.

791 F.2d at 510. *Accord Washington v. Dist. of Columbia*, 802 F.2d 1478, 1482 (D. C. Cir. 1986) ("The state did not force appellant to become a guard, and the state has no constitutional obligation to protect him from the hazards inherent in that occupation."). We relied on similar reasoning outside the government employment context in our case of *Jones v. Reynolds*, 438 F.3d 685 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 1141 (2007), where police showed up at a drag race, and one of the racers decided to back out of the race until the police reassured the crowd that they did not come to arrest anyone. In fact, the police stayed and played rap music over their car's public-address system for the delight of the crowd. There was a crash and bystanders were killed. *Id.* at 688-89. The court held that the police had not increased the risk to spectators. Judge Sutton wrote, "When a victim bears some responsibility for the risks she has incurred, it is even more difficult to say the 'state' has 'created' the 'danger' to her by its affirmative acts." *Id.* at 694. While this analysis is directly relevant to whether the requirement of an affirmative act has been satisfied, the same facts also bear on the culpability of the government actors. *But cf. Kallstrom*, 136 F.3d at 1063 n.3 (rejecting argument that city could require officers to waive constitutional protections as condition of employment).

---

governmental action that is 'arbitrary in the constitutional sense.'" *Id.*

The reluctance we have shown to create non-intentional constitutional torts in the public employment context received validation in the Supreme Court's recent decision in *Engquist v. Oregon Department of Agriculture*, 128 S. Ct. 2146 (2008). There, the Supreme Court held that an equal protection cause of action based on arbitrary conduct against a "class of one" would not extend to claims of government employees against their employers. *Id.* at 2157. While public employees do not surrender their constitutional rights in entering public employment, "those rights must be balanced against the realities of the employment context." *Id.* at 2152. It would be particularly disruptive of governmental operations to subject employment decisions based on characteristics unique to an individual--decisions which are by their nature subjective and discretionary--to constitutional rationality review. Decisions discriminating against identifiable classes of citizens, such as racially discriminatory firings, are more easily judged against a clear standard that enables governmental employer and courts alike to distinguish the permissible from the impermissible. *Id.* at 2153. Although we must bear in mind the Supreme Court's statement in *Collins* that public employment is not determinative in assessing due process liability for non-intentional acts, 503 U.S. at 119, *Engquist* at least gives us pause when asked to constitutionalize the school district's alleged misjudgments in choosing between service to its students and solicitude for its employees.

**(b) Need for haste or opportunity for deliberation by government actor.**

In *Lewis*, the Supreme Court stated that executive officials are held to a higher standard when they have the leisure to deliberate about a decision than when they have to act instantaneously. 523 U.S. at 851–54. Justice Souter reasoned that indifference to a prisoner's medical needs could be conscience-shocking when the governmental actor actually had the time to deliberate but chose not to care for or protect the prisoner:

> Nor does any substantial countervailing interest excuse the State from making provision for the decent care and protection of those it locks up; the State's responsibility to attend to the medical needs of prisoners [or detainees] does not ordinarily clash with other equally important governmental responsibilities.

*Id.* at 851-52 (internal quotation marks omitted). In contrast, when prison officials are reacting to an emergency, indifference will not be conscience-shocking because the importance of "competing obligations" and of deferring to decisions made in haste and under pressure make the court view the officials' actions more leniently. *Id.* at 852. "Like prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to tug against each other." *Id.* at 853. Justice Souter therefore concluded that deliberate indifference to the risk was not enough to make a cause of action against the police who engaged in a dangerous high-speed chase in *Lewis*. *Id.* at 855. In contrast, where there is the opportunity for "reflection and unhurried judgments," we have stated that government officials could be liable upon a showing that they were subjectively aware of a substantial risk of serious harm to the plaintiff. *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 469 (6th Cir. 2006); *Arledge v. Franklin County*, 509 F.3d 258, 263 (6th Cir. 2007).

This discussion about decisions made in haste and under pressure is a corollary to the theme that bad government decisions are not due process violations unless they are arbitrary, meaning that there is no legitimate reason for them. The need to act in haste is itself a governmental purpose that can justify executive actions that, if made at leisure, might appear irrational or arbitrary. *See Claybrook v. Birchwell*, 199 F.3d 350, 359-60 (6th Cir. 2000). Thus, conduct that might offend under a deliberate indifference test may still not be considered arbitrary if it was undertaken for a legitimate governmental purpose in a crisis requiring immediate response.

### (c) Countervailing governmental purpose.

Where the substantive due process claim arises out of a governmental actor's attempt to discharge duties which it is required by law or public necessity to undertake, courts are particularly unlikely to find the action arbitrary, even if the actor was imprudent in choosing one legitimate goal over another. *See Lewis*, 523 U.S. at 855. This Circuit discussed the need to allow governmental actors to balance competing governmental obligations in *Schroder v. City of Fort Thomas*, 412 F.3d 724 (6th Cir. 2005). There, the parents of a child killed by a speeding car sued the city on the theory that it violated substantive due process in setting the speed limit on their street and in failing to enforce the limit. We said that the plaintiffs had not established any of the elements of the state-created danger doctrine. In particular, the city was not culpable enough to shock the conscience, for in setting and enforcing a speed limit, the city was obliged to "choose between and among competing policy options." *Id.* at 729-30. Even creating a known risk in the process would not satisfy the culpability standard for substantive due process. *Id.* Similarly, in *Mitchell v. McNeil*, 487 F.3d 374 (6th Cir. 2007), an allegation that the City of Memphis had a policy of police lending their cars to confidential informants, one of whom killed the plaintiffs' child,  did not rise to the culpability level required for a substantive due process claim. The city's use of informants with criminal proclivities, though certainly not without risk  to the public, was undertaken for the legitimate purpose of fighting crime. *Id.* at 378. The policy did not shock the judicial conscience. *Id.*

Some authority from this Circuit indicates that whether the required culpability level is "intent to harm" or subjective deliberate indifference depends entirely on whether the situation is an emergency or allows time to deliberate. *See Ewolski v. City of Brunswick*, 287 F.3d 492, 510-13 (6th Cir. 2002); *Claybrook*, 199 F.3d at 359. *But see Draw v. City of Lincoln Park*, 491 F.3d 550, 555 (6th Cir. 2007) (stating flat intent to harm requirement in case that presented no obvious need for hasty action); *Upsher*, 285 F.3d at 453 (stating that intent to harm or punish is required in all non-custodial cases, without mentioning haste/deliberation factor). As the rule is articulated in these cases, if the situation is an emergency, the heightened intent standard would apply, and if there is time to deliberate, the lower deliberate indifference standard would apply. *See Ewolski*, 287 F.3d at 510-13. Superficially, this haste/leisure dichotomy might seem to preclude taking account of whether or not the government actor is or is not motivated by a countervailing legitimate purpose. If countervailing purposes could not be taken into account, in non-custodial, non-crisis situations, a government actor's choice could shock the conscience because he knowingly risked a person's life, even where he picked the lesser of two evils. By this reasoning, a policeman could not risk one person's life to save ten others. *Cf. Scott v. Clay County*, 205 F.3d 867, 876-77 (6th Cir. 2000) (in applying objective test for use of excessive force under the Fourth Amendment,[4] we balance the severity of the suspect's crime, the threat to others' safety, and whether the suspect is actively evading or resisting arrest). The outcomes in our cases do not support such an interpretation. As *Ewolski* demonstrates, some scenarios facing police or other governmental actors require agonizing choices, even if those choices do not have to be made in split seconds. In *Ewolski*, police had to choose whether to intervene aggressively in a hostage-taking crisis or to continue a stand-off. They chose to intervene, which led to a disaster when the hostage taker killed one of the hostages. We held that, even though the police chief was subjectively aware that aggressive intervention might result in harm to the hostages, he also had reason to believe that delaying could have led to such harm. *Ewolski*, 287 F.3d at 513-14. Therefore, even if he made a bad choice, his action was not deliberately indifferent and therefore did not shock the conscience. *Id.* at 516. For us to find deliberate indifference, therefore, we must find not only that the governmental actor chose to act (or

---

[4] The substantive due process test is more forgiving to governmental actors than the objective excessive force test applicable under the Fourth Amendment. *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001). Thus, if countervailing governmental purposes can always be taken into account under the Fourth Amendment balancing test, it would be anomalous if they were irrelevant under the substantive due process test.

failed to act) despite a subjective awareness of substantial risk of serious injury, but we also must make some assessment that he did not act in furtherance of a countervailing governmental purpose that justified taking that risk. After all, *Farmer v. Brennan*, 511 U.S. 825, 837 (1994), defines deliberate indifference in terms of "excessive risk," indicating that the need for the risk is being balanced against countervailing considerations. *Id.* at 844-45 (deliberate indifference standard "incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions") (internal quotation marks omitted). Thus, even where the governmental actor is subjectively aware of a substantial risk of serious harm, we will be unlikely to find deliberate indifference if his action was motivated by a countervailing, legitimate governmental purpose.

A recent Second Circuit decision pondered this problem. In *Lombardi v. Whitman*, 485 F.3d 73 (2d Cir. 2007), workers at the World Trade Center site alleged that the EPA had made misleading statements that lulled the plaintiffs into not protecting themselves from the health risks posed by the pollutants at the disaster site. The Second Circuit said the standard should not depend on whether the EPA's decisions were hurried or unhurried, since that is not the whole story. The statements characterized as misleading were meant to calm the public to encourage people to "return to their normal lives." *Id.* at 83.

> Hurried or unhurried, the defendants were subjected to the pull of competing obligations . . . . The complaint thus recognizes what everyone knows: that one essential government function in the wake of disaster is to put the affected community on a normal footing, *i.e.*, to avoid panic, keep order, restore services, repair infrastructure, and preserve the economy.

*Id.* (internal quotation marks omitted). The Second Circuit concluded that "substantive due process liability should not be allowed to inhibit or control policy decisions of government agencies, even if some decisions could be made to seem gravely erroneous in retrospect." *Id.* at 84. Since the government was acting for the benefit of the public, even a deliberate choice made with knowledge that it would endanger the plaintiffs' health would not shock the conscience. *Id.* at 85. "The conscience recognizes the dilemma of conflicting obligations." *Id.* at 82.

Granted, *Ewolski* intimated that there is some limit on the governmental actor's choice between legitimate goals, since *Ewolski* refused to hold that police could "take *any* risk with the lives of hostages in an armed standoff situation, as long as they did not act maliciously and sadistically to cause harm." 287 F.3d at 513. However, the case in which a governmental actor's choice between legitimate governmental purposes would shock the judicial conscience would have to be quite extreme, since we roundly criticized the police chief's choice in *Ewolski*, but we did not find he had committed a substantive due process violation. *Id.* at 516. Certainly, where the governmental actor was animated by a countervailing purpose that was a mandatory duty imposed by federal law or the Constitution, the possibility of his action shocking the judicial conscience is remote. In such cases, while we may disagree with the governmental actor's choice, the necessity of the choice was foisted upon him by federal law, and we have been loathe to hold that one clause of the Constitution is violated by executive action taken in furtherance of another clause or in obedience to another command of federal law.

This Circuit has held as much in several cases where we have said that we will not place governmental actors in a Catch 22 situation by imposing substantive due process liability for failure to do an act that might itself have exposed the actor to liability on another theory. We said in *Bukowski v. City of Akron*, 326 F.3d 702, 712 (6th Cir. 2003), that there was no due process violation where the plaintiffs contended the police should have detained their daughter against her will to protect her, but doing so could have made the police liable for depriving her of her liberty. "Under the legal theory adopted by the plaintiffs, the defendant officials would have violated the

Constitution no matter how they acted." *Id. Accord May v. Franklin County Comm'rs*, 437 F.3d 579, 585-86 (6th Cir. 2006); *Cartwright v. City of Marine City*, 336 F.3d 487, 494 (6th Cir. 2003); *see also DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 203 (1989) ("In defense of [the state officials] it must also be said that had they moved too soon to take custody of the son away from the father, they would likely have been met with charges of improperly intruding into the parent-child relationship, charges based on the same Due Process Clause that forms the basis for the present charge of failure to provide adequate protection."). This unavoidable liability doctrine is a specific application of the principle that a governmental actor's choice between legitimate governmental purposes is not, as a rule, arbitrary.

We faced the opposite situation in *Caldwell v. City of Louisville*, 120 Fed. Appx. 566 (6th Cir. 2004) (unpublished), in which we held that the evidence supported substantive due process culpability because the police officer's omission had no legitimate purpose. There, a police officer refused to serve a warrant on the victim's boyfriend because the victim had filed allegations of misconduct against the officer. The evidence supported the inference that the police officer acted for her own purposes rather than a governmental purpose. We found that the officer's conduct was sufficiently culpable to go to a jury on the claim of substantive due process violation. *Id.* at 576. Another such case was *Doe v. Claiborne County*, 103 F.3d 495 (6th Cir. 1996), where there was evidence that a teacher sexually abused a school child; such action would be "so lacking of any redeeming social value," *id.* at 507, that it would violate the child's substantive due process rights. Similarly, the facts in *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005), show an utter lack of a legitimate countervailing purpose; there, police allegedly beat a suspect after he had been subdued, then failed to give him medical attention while he lay in extremis. *Id.* at 599-600. We held that there was evidence sufficient to survive summary judgment that the police violated the victim's Fourteenth Amendment right to medical care while in custody. *Id.* at 603. *But cf. Draw*, 491 F.3d at 556 (actions of police who encouraged private parties to drag race--actions presumably without any legitimate governmental purpose--were nevertheless not conscience-shocking behavior).

In sum, our cases show that as a general rule, even where the governmental actor may be aware that his action poses a substantial risk of serious harm to the plaintiff, where some countervailing, mandatory governmental duty motivated that action, the action will not shock the conscience. While we have held open the possibility that in extreme cases the governmental actor's choice to endanger a plaintiff in the service of a countervailing duty would be deemed arbitrary, we need not reach that question to decide this case, as can be seen from our application of the arbitrariness standard below.

## IV. Application of Arbitrariness Standard.

Our review of *Lewis* and our own substantive due process cases indicates that where the governmental actor does not intentionally harm the victim or invidiously discriminate against him, conduct endangering the victim will not shock the conscience if the victim has voluntarily undertaken public employment involving the kind of risk at issue and the risk results from the governmental actor's attempt to carry out its mandatory duties to the public. This holds true even where the governmental actor is not forced to act in a crisis, but has time to deliberate.

In order to comply with the Individuals with Disabilities Education Act, the school district is, of course, obliged to provide a free appropriate public education to children with disabilities, 20 U.S.C. § 1412(a)(1). The school district's obligations include helping the child "participate in extracurricular and other nonacademic activities." 34 C.F.R. § 300.320(a)(4)(ii). The school district hired Hunt as a chaperon at the Partners Club event precisely to help achieve this goal. The IDEA is, in turn, a comprehensive scheme "set up by Congress to aid the States in complying with their constitutional obligations to provide public education for handicapped children." *Arlington Cent.*

*Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 305 (2006) (Ginsburg, J., concurring in part and concurring in judgment) (quoting *Smith v. Robinson*, 468 U.S. 992, 1004 (1984)).

There is record evidence indicating that the school district had staff training in handling student behavioral issues and procedures for addressing particular children's behavioral problems. The district initiated a behavioral intervention plan for A-- in November 2002. However, taking into account at least thirty-one incident reports involving A--, we must conclude that the record creates an issue of fact as to whether Laurel Frank, the school district's Assistant Director of Student Services, was subjectively aware of the risk and failed to respond to it. At her deposition, Ms. Frank admitted that before the day of Hunt's injury, Ms. Frank was present at meetings concerning A-- at which the group discussed A--'s history of "attempting to bite, bit[ing] another, hitting another, ripping the teacher's clothing with her teeth, and scratching at teacher's face." In the face of this kind of evidence, Ms. Frank testified:

> Q. Did you feel that she posed a risk of harm to staff or teachers that had to work with her?
> . . .
> A. No, no real harm.

Even if the school district was conscious of the risk of harm to Hunt, no one contends that the school district's actions were prompted by any purpose other than fulfilling its obligation to educate A--. This is a case of competing governmental duties. Ms. Frank indicated that the school district cannot simply decline to educate A-- on the basis of behavior that was a manifestation of her disability. She also stated that the school district is "charged and obligated [under the IDEA] to educate kids under the least restrictive environment," as indeed it is, 20 U.S.C. § 1412(a)(5). A--'s teacher, Priscilla Masters, testified that she considered the junior high school that A-- attended to be the appropriate least restrictive environment for A--. The urgency of a countervailing duty must be conceded to be particularly compelling here, where the duty to educate a child with dangerous propensities was imposed upon a local government actor by federal law, which in turn was adopted to further compliance with constitutionally imposed obligations. Had the school district placed A-- in a more restrictive environment, it could well have been liable to her for denying her a free appropriate public education. While Hunt may disagree with the school district's reading of the IDEA or its application of the IDEA in A--'s case, there is no question but that Hunt was hired and, indeed, exposed to whatever dangers attended caring for A-- because the school district was attempting to discharge its duties under the IDEA.

Moreover, this was a case in which the governmental employee knowingly undertook a job that was risky. Priscilla Masters testified that it was "a normal occupational hazard" to be bitten by the twelve-to sixteen- year old children in their special education room. Hunt knew before the 2002-03 school year that A-- hit, kicked, and bit. A-- had bitten Hunt earlier in the year, and Hunt knew she had injured another aide. She knew A-- had thrown a sewing machine at a student, and, on another occasion, Hunt saw her throw a computer across a classroom. Nevertheless, Hunt volunteered for extra assignments that required her not only to be near A--, but to control her. It was admirable of Hunt to be willing to care for and monitor this volatile child, but the work was obviously dangerous.

In light of Hunt's voluntary undertaking of this hazardous employment and the school district's duty under the IDEA to educate a child with dangerous propensities, even assuming Hunt can establish that the district was chargeable with actual knowledge of the risk and failure to address it, we cannot say that the school district's actions were constitutionally arbitrary.

Hunt has adduced no evidence against Dr. Mantia that indicates she had any higher level of culpability than did the school district. Therefore, she has failed to establish a genuine issue of material fact either as to the school district or Dr. Mantia.

Therefore, we must affirm the district court's entry of judgment against Hunt and in favor of the school district and Dr. Mantia.