NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0416n.06

No. 20-6392

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| VERNON DAHL III, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Sep 02, 2021 |
| | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| JERMAINE KILGORE, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |

Before: GIBBONS, STRANCH, and BUSH, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. On February 13, 2017, off-duty Kentucky State Police officer Jermaine Kilgore saw Vernon Dahl III walking around Kilgore's apartment complex in a manner he found suspicious. Kilgore stopped Dahl and, after some conversation, became concerned with Dahl's explanation that he was there to visit his girlfriend, Cher Fillmore, who also lived in the complex. Kilgore took Dahl's phone and called Fillmore, despite seeing no substantial evidence that she was in urgent need of assistance. After knocking on Fillmore's door without response, Kilgore returned Dahl's phone. Dahl alleges that, in the process of taking his phone, Kilgore "jam[med] [his] thumb" and thus injured him. DE43-2, Dahl Interview, Page ID 228. Dahl sued Kilgore, Fillmore, and another state police officer who was on the scene, Nicholas Lietz, for defamation, assault, battery, and violation of his Fourth Amendment rights. The district court granted Lietz's and Fillmore's motions for summary judgment, and Kilgore's motion for summary judgment as to the assault and defamation claims. The district court denied Kilgore's motion as to the battery and Fourth Amendment claims, holding that he was not entitled to qualified

immunity on either claim. Kilgore brings this interlocutory appeal of the denial of qualified immunity, and we affirm.

I.

At around midnight on February 13, 2017, Vernon Dahl III went to the apartment of Cher Fillmore, whom he was dating, to "see if she was awake." *Id.* at Page ID 224. He arrived at her apartment complex, "got out of [his] vehicle, [and] walked to the back side of her apartment to see if her lights were on." *Id.* When he saw that her lights were off, he headed back to his car to return home when Jermaine Kilgore, a Kentucky State Police officer, walked up and introduced himself to Dahl. Kilgore was off duty at the time but was wearing "khaki pants, . . . a gun belt, [a badge,] and . . . a state police polo shirt." DE46-1, Kilgore Dep., Page ID 515−16. Kilgore had an "informal" arrangement with the police department in which he would conduct security surveillance at the apartment complex, where he also lived, because of recent break-ins.[1] *Id.* at Page ID 505−06. He was conducting this surveillance from inside his car when he saw Dahl walk across the parking lot toward a "maintenance shop" on the property. *Id.* at Page ID 514. When Dahl walked out of sight, Kilgore got out of his car and walked around the building where he encountered Dahl.

Kilgore asked Dahl what he was doing and whether he lived at the property, to which Dahl responded, "No, my girlfriend does," referring to Fillmore. DE43-2, Dahl Interview, Page ID 224. Dahl showed Kilgore his identification, and Kilgore continued to question him and searched him for weapons.[2] He asked Dahl why he did not text or call Fillmore, and Dahl responded that he "didn't wanna wake her up." *Id.* at Page ID 225.

---

[1] In addition to his informal arrangement with the state police, Kilgore lives at his apartment rent-free in exchange for providing security.

[2] The record is unclear on how this search came about. Kilgore called it a *Terry* frisk, implying reasonable suspicion that Dahl was armed, but there is little support for this in the record. *See* DE46-1, Kilgore Dep., Page ID 520. Dahl's

At this point, an on-duty Kentucky State Police officer, Nicholas Lietz, arrived. Lietz was driving through the complex checking for car break-ins when he saw Kilgore, with whom he was familiar, and Dahl. Lietz approached the two men, and Kilgore handed him Dahl's ID card, which Lietz took back to his car to run through the state database. While Lietz was running Dahl's license, Kilgore continued questioning Dahl about his relationship, asking whether he and Fillmore were "having issues." DE43-2, Dahl Interview, Page ID 226. When Dahl responded that he and Fillmore had recently broken up and gotten back together, Kilgore asked Dahl if he was "sure [he wasn't] over [t]here to see if she was with somebody else." *Id.* at Page ID 227. Dahl said no, he was only there to "discuss some stuff." *Id.* Kilgore responded that Dahl looked "suspicious" because his clothes were dark. *Id.*

Shortly after, Dahl attempted to terminate the conversation. He took his phone out of his pocket to contact an attorney, holding it "in [his] right hand with just two fingers." *Id.* at Page ID 228. The parties dispute what happened next. Dahl says that Kilgore tugged the phone out of his hand and when he tried to resist, "lunge[d] towards [him] with his other arm and pushe[d] [his] phone back into [Dahl's] thumb, which jam[med] [Dahl's] thumb back." *Id.* Kilgore, on the other hand, says that Dahl voluntarily showed him "text messages [with Fillmore] on his phone" from "about half an hour before." DE46-1, Kilgore Dep., Page ID 521. Kilgore says Dahl then handed him his cell phone to show him a video game that Dahl had been playing and text messages. He says Dahl then "became aggravated and attempted to take the phone away," and that Kilgore "gently placed [his] hand on [Dahl's] chest and pushed him back," telling Dahl to back up and give him space. *Id.* at 525−26. Both parties agree that Kilgore then used Dahl's phone to call

---

interview suggests that it may have been a consent search because Kilgore told Dahl that he was "gonna search [Dahl] for weapons" and Dahl responded "okay." DE43-2, Dahl Interview, Page ID 225. Regardless, Dahl does not contest the reasonableness of the initial stop or of the frisk, and we need not address it further.

Fillmore,[3] but she did not answer. Kilgore went to Fillmore's door and banged on it, but again she did not answer. Eventually, Fillmore texted Dahl, which Kilgore took as confirmation that she was safe, and he released Dahl.

Kilgore followed up with Fillmore the next day. He told her how to obtain an interpersonal order of protection ("IPO"), and she subsequently obtained one against Dahl. Kilgore independently spoke to the management at his and Fillmore's building, and they issued Dahl a notice that he was no longer allowed on the building's property.

Dahl then sued Kilgore, Lietz, and Fillmore in Kentucky state court over the incident. He sued Kilgore and Lietz for violating his Fourth Amendment rights, assault, and battery. He sued Kilgore and Fillmore for defamation. The defendants removed the suit to the United States District Court for the Western District of Kentucky. All defendants moved for summary judgment, and the district court granted Lietz and Fillmore summary judgment on all claims and Kilgore summary judgment on Dahl's defamation and assault claims. The district court denied Kilgore's motion for summary judgment on Dahl's Fourth Amendment and battery claims.

As to the Fourth Amendment claim, the district court held that Kilgore's search through Dahl's cell phone was unconstitutional. In doing so, the district court rejected Kilgore's argument that the search fell into a community caretaking exception to the Fourth Amendment's warrant requirement because Kilgore did not reasonably believe that the cell phone search was necessary to prevent imminent injury. The court further held that, because Dahl's right was clearly established at the time of the encounter, Kilgore was not entitled to qualified immunity. Dahl's battery claim was based on Kilgore jamming Dahl's thumb while seizing his phone. The district

---

[3] Kilgore denies "going through" Dahl's phone to find Fillmore's number, saying that he was able to call her directly from the "text screen." DE46-1, Kilgore Dep., Page ID 521. Dahl insists that Kilgore did "go[] through [his] phone, tap[ped] on [Fillmore's number] and call[ed] her." DE43-2, Dahl Interview, Page ID 228.

court denied Kilgore qualified immunity under Kentucky law on this claim because there is a factual dispute over the degree of contact between the men when Kilgore took possession of Dahl's phone.

## II.

We have jurisdiction to hear an interlocutory appeal of a denial of qualified immunity where it concerns only "a question of law." [4] *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985). The relevant question of law in a qualified immunity case is "whether the law clearly proscribed the actions [of] the defendant" and "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged action[]." *Id.* Where, however, qualified immunity is denied because of a factual dispute between the parties, the resolution of which is necessary for us to reach a legal conclusion, we lack jurisdiction to review the denial before the district court has issued a final judgment in the case. *Id.* at 527−28; *see also DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 611−12 (6th Cir. 2015). Where the legal and factual questions are intertwined, we must separate the factual (unreviewable question) from the legal (reviewable question). *DiLuzio*, 796 F.3d at 610.

Kilgore first appeals the denial of qualified immunity for Dahl's Fourth Amendment claim—the search of his cell phone. Because the parties agree on the relevant facts and the question before us is purely legal, we have jurisdiction. *Forsyth*, 472 U.S. at 527.

The district court's denial of qualified immunity on Dahl's battery claim rested on the fact that the parties dispute the level of relevant physical contact between Kilgore and Dahl. Kilgore's

---

[4] Kilgore argued that he was entitled to federal qualified immunity on Dahl's Fourth Amendment claim. Because Dahl's battery claim was brought under state law, the relevant qualified immunity is Kentucky's state qualified immunity. *See* DE50, Memo re. Summ. J., Page ID 863 (quoting *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)). Because the Supreme Court's decision in *Forsyth* as to federal jurisdiction over interlocutory appeals of denials of qualified immunity applies with equal force to state immunity, the analysis is the same for both claims.

5

argument, however, is not that he did not jam Dahl's thumb but rather that he is entitled to qualified immunity under Kentucky law for the battery claim regardless because Kentucky law enables officers to "use force to execute their public duties." CA6 R.15, Appellant's Br., at 21−22; *see also* DE46, Mot. for Summ. J., Page ID 491−92. This includes the use of "reasonable force necessary to seize an item." CA6 R.15, Appellant's Br., at 22.

Whether a use of force was reasonable is "a pure question of law." *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)). Kilgore's argument on appeal is that even if the court accepts Dahl's articulation of the facts, he is entitled to qualified immunity under Kentucky law for any force because his search of the phone was a reasonable, discretionary action.

### III.

We review a denial of summary judgment de novo. *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008). "Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Id.*

Kilgore argues that he is entitled to qualified immunity on both of Dahl's remaining claims. The first is Dahl's claim that Kilgore violated his Fourth Amendment right to be free from unreasonable searches when Kilgore looked through his phone for Fillmore's number and called her without a warrant. Kilgore argues that he is immune from this claim because the search fit into a community caretaker exception to the Fourth Amendment warrant requirement based on his belief that Dahl posed an immediate danger to Fillmore. He argues that he is entitled to qualified immunity under Kentucky law for Dahl's battery claim for essentially the same reason—state law permitted him to use reasonable force to ensure that Fillmore was safe.

Kilgore is entitled to qualified immunity from suit under 42 U.S.C. § 1983 unless Dahl can prove that Kilgore violated a clearly established constitutional right. *Forsyth*, 472 U.S. at 524. [5] "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Taylor v. Riojas*, 141 S. Ct. 52, 53−54 (2020) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "The correct inquiry . . . [is] whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the 'situation [which he] confronted.'" *Mullenix*, 577 U.S. at 13 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004)).

A.

The constitutional right that Dahl claims Kilgore violated arises under the Fourth Amendment. The Fourth Amendment to the United States Constitution ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is "reasonableness."'" *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). The Supreme Court has generally required

---

[5] Neither party contests the fact that § 1983 is appropriate here because Kilgore was acting under the color of state law. *Cf. Rankin v. McPherson*, 483 U.S. 378, 380−81 (1987) (holding that defendant was not acting under color of state law because "[s]he was not a commissioned peace officer, did not wear a uniform, and was not authorized to make arrests or permitted to carry a gun"). Kilgore was wearing state police polo shirt, a gun belt, and his police badge. *See Williams v. United States*, 341 U.S. 97, 99 (1951) (a private officer who was sent by a superior to work for a private company and "went about flashing his badge" was acting under color of state law). Further, neither party contests the fact that off-duty officers are entitled to qualified immunity. Indeed, we have extended this protection to off-duty officers in the past. *See McDonald v. Flake*, 814 F.3d 804, 814–15 (6th Cir. 2016); *Swiecicki v. Delgado*, 463 F.3d 489, 496 (6th Cir. 2006), *abrogated on other grounds by Wallace v. Kato*, 549 U.S. 384 (2007).

that, in order to be "reasonable," the police obtain a warrant before they undertake a search. *Id.* at 382.

This warrant requirement is subject to several specific exceptions. One such exception is for searches incident to arrest. In 2014, the Supreme Court held that police may not search a cell phone without a warrant during such a search because the cell phone did not fit into the search incident to arrest exception. *Id.* at 386. In its opinion, the Supreme Court likened a cell phone to the home, which has traditionally received the highest level of Fourth Amendment protection. *Id.* at 396−97 ("Indeed, a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is."); *see also Chimel v. California*, 395 U.S. 752, 761 (1969) ("And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home."). The court did not create a rule prohibiting *all* warrantless searches of phones, but it did state that to search a phone "'the exigencies of the situation' [must] make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Riley*, 573 U.S. at 402 (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)) (second alteration in original). "Such exigencies could include the need to prevent the imminent destruction of evidence in individual cases, to pursue a fleeing suspect, and to assist persons who are seriously injured or are threatened with imminent injury." *Id.* (citing *King*, 563 U.S. at 459).

Kilgore rests the constitutionality of his warrantless search of Dahl's cell phone on the "community caretaking" exception to the warrant requirement. The Supreme Court has mentioned a limited exception for community caretaking, at least in the context of vehicles, which allows

8

police to conduct a warrantless search when they are "not engaged in the 'often competitive enterprise of ferreting out crime.'" *United States v. Rohrig*, 98 F.3d 1506, 1523 (6th Cir. 1996) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)); *see also Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). We have recognized that such an exception may operate to shield police when they are acting in furtherance of a compelling governmental interest outside traditional law enforcement functions. However, the Supreme Court's recent decision in *Caniglia v. Strom* casts doubt as to whether the community caretaker exception exists outside the vehicular context, if at all. 141 S. Ct. 1596 (2021).

We have considerable doubt that a community caretaking exception would apply to cell phone searches in any scenario. The Supreme Court recently clarified that, while it had allowed for warrantless searches of vehicles in the name of community caretaking, it had not "create[d] a standalone doctrine that justifies warrantless searches and seizures in the home." *Caniglia*, 141 S. Ct. at 1598. In its holding, the Court specifically noted that the exception is justified, at least in part, by the fact that police officers are patrolling "public highways." *Id.* We underscored that holding shortly afterwards in *Clemons v. Couch*, holding that an officer could not "justify warrantless entry into [a person's] home by calling on the community-caretaker exception." 3 F.4th 897, 903 (6th Cir. 2021). As noted above, the Supreme Court has made clear that a cell phone is more similar to a home, in terms of the amount of private information stored within it, than it is to a vehicle. In the brief time that he searched Dahl's phone, Kilgore was able to view private communications with Dahl's girlfriend and use her number, stored in Dahl's contacts, to call her. Given the Supreme Court's clear indication that no community caretaking exception applies to warrantless searches of the home, it is possible that this exception would not apply to cell phone searches. *Caniglia*, 141 S. Ct. at 1598.

Even if there are scenarios in which the police may conduct such a search, this is not one of them. To make his warrantless search of Dahl's phone reasonable under the Fourth Amendment, Kilgore would have to show "true immediacy," such as having sufficient evidence to believe that Fillmore was "seriously injured or threatened with such injury." *United States v. Washington*, 573 F.3d 279, 287 (6th Cir. 2009); *see also Riley*, 573 U.S. at 388 (noting that exigent circumstances may justify a warrantless cell phone search).

To the extent that we have applied the community caretaking exception outside the vehicle context and those applications survive *Caniglia*, we have done so only when police are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," *United States v. Williams*, 354 F.3d 497, 508 (6th Cir. 2003) (quoting *Cady*, 413 U.S. at 441), and are instead engaged in activities such as "assist[ing] persons who are seriously injured or threatened with such injury," *Washington*, 573 F.3d at 287 (quoting *Brigham City*, 547 U.S. at 403). "As we have repeatedly and consistently observed, the critical issue is whether there is a 'true immediacy' that absolves an officer from the need to apply for a warrant and receive approval from an impartial magistrate." *Id.* at 288 (citation omitted). To permit a warrantless search of a Fourth Amendment protected space such as a cell phone when the circumstances are not "urgent or life threatening . . . would certainly [make] 'the presumption of unreasonableness . . . difficult to rebut.'" *Id.* at 289 (second alteration in original).

We have found sufficient evidence to justify a caretaking search in cases where the police have been called to the scene of some sort of disturbance or have themselves witnessed persons putting themselves or others in danger.[6] For example, in *United States v. Lewis*, the police

---

[6] The only case in which police did not respond to a call is *United States v. Koger*, where the court applied the exception to the search of a vehicle that police found stopped on a highway, partially blocking the road, with an apparently unconscious person in the driver's seat. 152 F. App'x 429, 429−30 (6th Cir. 2005).

responded to calls about a highly intoxicated woman, approached her boyfriend's car, and opened the door to attempt to get her home safely. 869 F.3d 460, 461 (6th Cir. 2017). The officers ultimately found drugs in the car, leading to the arrest and charging of her boyfriend, who argued that the search was unconstitutional. *Id.* at 462. We held that the search fit into the community caretaker exception because the officers were not acting with a "traditional law enforcement purpose," but instead intended to help a visibly intoxicated woman. *Id.* at 463. Similarly, in *Ziegler v. Aukerman*, the police responded to a 911 call from a hospital where staff told them that a suicidal woman had left the hospital and returned home. 512 F.3d 777, 780 (6th Cir. 2008). The police found the woman outside her home and returned her to the hospital. *Id.* She sued the police officers, but we held that the exigent circumstances exception applied because the officers were acting in a community caretaking capacity. *Id.* at 785. The mere fact that the hospital had classified her as suicidal was enough to demonstrate that she was a danger to herself. *Id.* at 786. The court noted that "[w]hether the present danger required swift action must be determined by looking at all the facts," and the fact that suicide can be accomplished both quickly and alone required swift police action. *Id.* at 786.

Kilgore based his determination that Fillmore was in danger on four pieces of evidence. First, Dahl was parked in a different area of the parking lot than he usually was.[7] Second, Dahl was walking around in dark clothing in a suspicious manner behind buildings late at night. Third, Dahl looked up to see if Fillmore's lights were off. Fourth and finally, Kilgore saw a brief text message conversation between Dahl and Fillmore that read as follows:[8]

---

[7] Kilgore had previously seen Dahl and Fillmore together, and said that Dahl "typically[] park[ed] in the same court" as Kilgore. DE46-1, Kilgore Dep., Page ID 511.

[8] Kilgore also claims that Dahl was telling conflicting stories because his account of his relationship with Fillmore did not line up with the text messages that Kilgore saw. But it is not clear how Dahl's story—that the two were having issues—conflicts with the text messages, which seem to indicate that he wanted to discuss or continue their relationship and that she did not.

11

> [Dahl] Just an FYI, I was going to ask you to dinner tonight because you're not available Tuesday
>
> [Fillmore] I'm not interested in Valentine's Day.
>
> [Dahl] I don't think you are interested in much with me
>
> [Fillmore] I've been really honest about where I'm at.
>
> [Dahl] Night
>
> [Fillmore] Night

DE46-5, Text Messages, Page ID 734−36.

There is nothing threatening in these text messages. Fillmore does not seem alarmed or intimidated, and Dahl apparently accepted her conclusion, bidding her goodnight. Dahl was not intoxicated or agitated in his discussion with Fillmore. He was not armed. He was not approaching her building, either by window or door, with the apparent intent to peek inside or break in. In fact, Dahl was returning to his car when Kilgore stopped him. He was not out of breath, and there was no blood on his clothes or other signs of a recent physical altercation. *Cf. Brigham City*, 547 U.S. at 401 ("[t]he officer testified that he observed the victim of the blow spitting blood into a nearby sink"); *Cady*, 413 U.S. at 437 (applying an exception to the warrant requirement where police saw blood in a car). In short, nothing supported a reasonable belief that Dahl had either very recently, or was imminently about to, physically injure Fillmore. As in *Williams*, any belief was at most "speculative." *Williams*, 354 F.3d at 507−08.[9] Without the belief that there was an imminent danger requiring swift action, there was no justification for Kilgore to take Dahl's phone to contact Fillmore. *Ziegler*, 512 F.3d at 786.[10] It is also worth noting that nothing prevented Kilgore from

---

[9] As is the case here, the police in *Williams* were not entirely lacking evidence. The landlady had called them noting high water bills (she suspected a water leak), an odd smell, and suspicious circumstances inside the house including leaves and dirt on the floors. *Williams*, 354 F.3d at 500.

[10] Kilgore argues that Kentucky law justified his conduct. Kentucky Revised Statute 456.090(2) permits officers to "use all reasonable means to provide assistance to the victim" of dating violence. But Kentucky law does not have a bearing on Dahl's constitutional rights. Further, there was simply insufficient evidence to sustain Kilgore's belief that

checking on Fillmore—he could have gone to her apartment at once to knock on the door. In fact, a person may reasonably assume that knocking on the door would more likely produce a result than calling her from the cell phone of someone to whom she did not wish to speak.

In conclusion, the Supreme Court in *Riley* clearly established Dahl's right to be free from an unreasonable search of his cell phone. 573 U.S. at 400−01. The community caretaking exception does not apply to these facts. Therefore, the district court correctly rejected Kilgore's arguments for qualified immunity against Dahl's Fourth Amendment claim.

B.

Kilgore also appeals the district court's denial of qualified immunity, and thus of summary judgment, in Dahl's state law battery claim. We affirm the district court.

Similar to its federal analogue, Kentucky law grants state officers qualified, or "official," immunity against civil suits for actions "performed in the exercise of their discretionary functions." *Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2001). Discretionary acts are "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 477 (Ky. 2006) (quoting *Yanero*, 65 S.W.3d at 522). When an officer acts negligently, he or she is entitled to qualified immunity for the performance of "(1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the [officer's] authority." *Yanero*, 65 S.W.3d at 522 (internal citation omitted).

---

Fillmore was a victim of dating violence. The district court correctly noted that, to the extent that Dahl's behavior was suspicious, it could not be called stalking because "[s]talking requires two or more acts that seriously alarms, annoys, intimidates, or harasses a person." DE50, Memo. re. Summ. J., Page ID 853 (citing Ky. Rev. St. 508.130(2)). What's more, if Kilgore was searching Dahl's phone to see if there was evidence of stalking, then his actions would not be divorced from criminal investigation and thus would not fit into the community caretaking exception.

Kilgore argues that his actions were discretionary and undertaken in good faith because he reasonably believed that he needed to "render aid or assistance to Ms. Fillmore." CA6 R.15, Appellant's Br., at 23. As explained at length above, cell phone searches likely do not fall into a community caretaking exception, and, regardless, Kilgore did not have sufficient evidence to reasonably believe that Fillmore needed immediate aid. Therefore, his citation to Kentucky Revised Statute 503.040 for the proposition that officers may use force to lawfully seize and search an item is unavailing—he was not acting with reasonable force where he lacked reasonable suspicion. For the same reasons as those detailed above, the district court did not err in concluding that Kilgore was not entitled to qualified immunity under Kentucky law, and Dahl may proceed with his claim for nominal damages. At trial, Kilgore will have the opportunity to put on evidence as to the extent of contact between him and Dahl and may make his argument that he never jammed Dahl's thumb. We merely hold today that, accepting the facts as presented by Dahl, Kilgore had no justification to use force to seize Dahl's cell phone.

## IV.

We affirm the denial of Kilgore's motion for summary judgment for Dahl's claims under the Fourth Amendment and Kentucky state law.