RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0205p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KIRK TANNER and DEANNA TANNER, individually
and as natural guardians, parents, and next friends of
BREANNE TANNER, CHRISTOPHER TANNER, and
KYLER TANNER,

         *Plaintiffs-Appellants,*

     *v.*

COUNTY OF LENAWEE, NATHAN ANDREW ADAMS,
CHRISTOPHER JOHN HUNT, CLETUS B. SMITH, and
LARRY RICHARDSON,

         *Defendants-Appellees.*

No. 05-1107

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-71232—Nancy G. Edmunds, District Judge.

Submitted: May 30, 2006

Decided and Filed: June 22, 2006

Before: GILMAN, SUTTON, and COOK, Circuit Judges.

---

## COUNSEL

**ON BRIEF:** Courtney E. Morgan, Jr., MORGAN & MEYERS, Dearborn, Michigan, for
Appellants. Cynthia L. Reach, REACH, REACH, FINK & VALVO, Ann Arbor, Michigan, for
Appellees.

---

## OPINION

---

    RONALD LEE GILMAN, Circuit Judge. This case arises from a tragic and deadly incident
at the rural Michigan home of the Tanner family that occurred around 3:00 a.m. on October 13,
2001. Kirk and Deanna Tanner had taken in Deanna's sister Cindy Baker because she was involved
in a domestic dispute with her husband Keith Baker ("Baker"). Baker had appeared at the house the
evening before both drunk and angry. The Tanners called the police when he came again in the
middle of the night. Just as Baker was backing out of the driveway, the police arrived. Baker
reacted by driving back up the driveway to the house, after which he got out of his vehicle, forced

1

his way into the residence, shot Kirk five times, shot Deanna twice, shot and killed his wife Cindy, and then committed suicide by shooting himself in the head.

The Tanners fortunately survived their gunshot wounds. They subsequently brought suit against Lenawee County, the law-enforcement officers who initially responded to the 911 call, the County Sheriff, and the Incident Commander of the Emergency Response Team ("ERT"), a multi-jurisdictional group that responds to dangerous situations in Lenawee County at the request of local law enforcement. Among other claims, the Tanners alleged that they were deprived of their constitutional right to substantive due process based on the manner in which the defendants handled the confrontation with Baker. The district court granted the defendants' motion for summary judgment on the basis that the Tanners had failed to demonstrate that their constitutional rights were violated. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.     Factual background

#### 1.      *Repeated visits to the Tanner home by an intoxicated Baker prompt a 911 call*

The Tanner family lives in a house at the end of a 400-foot driveway in rural Michigan. On the night of October 12, 2001, Deanna's sister Cindy was staying there because of arguments that had ensued at Cindy's own home when she told Baker that she wanted a divorce. Baker, who was intoxicated and angry, had appeared at the Tanner home on several occasions that night looking for Cindy. The final visit came shortly before 3:00 a.m. on October 13, 2001. As Baker drove his vehicle up the Tanners' driveway, Kirk told Deanna to call 911. Deanna did so at 2:59 a.m. and told the 911 operator that Baker was drunk and armed. The operator told Deanna that there were officers in the vicinity and to stay on the line.

Baker made his way to the front door of the Tanner house. After Baker knocked on the door, Kirk told him that the police were on the way. Baker started kicking the door and yelling that he wanted to see Cindy. Kirk held the door to keep it from breaking open. Baker left the front door and began pounding on the walls and windows of the house. At this point, Deanna asked the operator "Where are [the police]? Where are they? Why aren't they here yet?" The operator replied "Stay on the line. They'll be there."

Kirk saw a vehicle pass the house that he thought was a squad car, so he began turning the front porch light on and off to attract attention. Baker returned to the front door and Kirk again told him that the police were on their way. Upon hearing this, Baker walked to his vehicle. Relieved, Kirk stepped out onto the back deck to smoke a cigarette.

#### 2.      *Officers Adams and Hunt respond to the 911 call*

Officers Adams and Hunt were two to three miles from the Tanner home when they received the dispatch that its occupants were in need of assistance. Dispatch told the officers that "[t]here was an individual there that they believed may have been intoxicated, that had stated they [sic] had a weapon, and may be trying to gain entry into the house." As the officers neared the Tanner residence, they could not locate any address on the house or the mailbox. After driving by the house for the second time, the officers saw brake lights in the driveway and concluded that this must be the Tanner home because there was no other activity at the surrounding residences at this hour. The officers turned around and pulled in the driveway just as a vehicle was starting to back up. Deanna saw the officers pull in and mistakenly told the 911 operator that it was her husband Kirk, and not Baker, who was currently backing down the long driveway. Despite Deanna's mistake, the record does not indicate that this information was relayed to the officers.

As the officers drove up the driveway, the vehicle driven by Baker stopped backing up and started moving towards the house. The officers followed the vehicle back up the driveway until it stopped in front of the garage. Around this time, Officer Hunt concluded that the driver of the vehicle was the individual that they had been called to the Tanner home to stop, but Officer Adams made no such deduction. There are several different versions of what happened next.

•          Officer Hunt testified by deposition that both he and Adams exited their squad car as Baker stepped out of his vehicle. Hunt said that he had his hand on his gun while Adams was yelling for Baker to show his hands. Baker turned towards the officers and then ran in the opposite direction as he pulled a handgun from his waist. When Hunt saw Baker pull his gun, he yelled "gun, gun, gun" and pulled out his own gun. Hunt then started chasing Baker on foot. Just after Baker disappeared into the darkness, Hunt tripped over something and fell to the ground. As Hunt got back up and tried to continue running, he heard gunshots.

•          Officer Adams testified by deposition that he exited the squad car just after Baker stopped pulling forward. Speaking loudly, Adams told Baker to stop and asked him to show his hands, but Baker ran towards the house and pulled out a gun. Adams then started chasing Baker on foot, running as fast as he could. Once Adams saw Baker's weapon, he drew his own gun. Baker disappeared into the darkness, causing Adams to head back to the squad car to radio dispatch and to retrieve a rifle.

•          The Sheriff's Office Incident Report states that Adams, instead of running after Baker as he said in his deposition, ran around the house in the opposite direction from Hunt to try to head Baker off.

•          Kirk Tanner testified by deposition that he looked out the window of his house and saw Baker standing outside. Baker then made a movement consistent with putting a clip of ammunition into his gun. Kirk then saw Baker walk around the house. Contrary to the statements of the officers, Kirk said that they were sitting in their squad car as Baker headed towards the house. In a statement to police the day after the incident, however, Kirk said that as Baker ran around behind the house, "[t]he cop was chasing him."

•          Kirk Christopher ("KC") Tanner, who was 11 years old at the time, was also watching the scene unfold from a window. He testified by deposition that the officers did not say anything to Baker as the latter ran towards the house.

•          In their Second Amended Complaint, the Tanners allege that Adams and Hunt ordered Baker "to stop and show his hands," "but did nothing further to enforce their order after the assailant ignored their order."

### 3.          *Baker shoots his way into the Tanner house*

After Baker made his way to the back of the Tanner home, he shot through a sliding glass door, hitting Kirk four times. Kirk, gushing blood, retreated to the bedroom where his wife and son KC were, but Baker followed and shot Deanna. In response, Kirk swung a piece of wood at Baker and hit him in the head. Baker then shot Kirk for a fifth time while Deanna and KC ran from the room. As they attempted to make their way out of the house, Baker shot Deanna again. Kirk eventually fell to the floor in the living room, phasing in and out of consciousness. Deanna ran out of the broken sliding glass door and around the house towards the officers and the squad car, but her son did not follow her. KC later ran through the broken sliding glass door as well. He joined his mother in the back of the squad car.

At this point, Breanne Tanner (age 7) was hiding in the closet of her room with her aunt, Cindy Baker. Kyler Tanner (age 10) was also in the room. Both children saw Baker pull Cindy out

of the closet and lethally shoot her. During the shooting, a stray bullet hit Breanne in the leg. Kyler took Breanne out of the bedroom and into the living room. Kyler then went back to the bedroom where he saw Baker put a gun to his head, realize that it was not loaded, pick up a second gun, and shoot himself in the head. Kyler got towels for his father and his sister. The two children then left the house through the broken sliding glass door and made their way to the police officers, who were standing behind Kirk's truck in the driveway. They told the officers that "Uncle Keith" had shot himself in the head. The officers could hear Kirk moaning inside of the house.

Adams and Hunt did not enter the residence because they were instructed to await the arrival of Cletus Smith, the ERT Incident Commander. The ERT was dispatched to the scene at 3:15 a.m. When Smith and Sheriff Larry Richardson arrived, Sheriff Richardson ceded command to Smith because Smith was the ERT Incident Commander. At 3:30 a.m., field interviews of the children were conducted. KC told the officers that his father had been shot at least four times and was lying on the floor in the living room. Kyler told the officers that Baker had shot himself in the head and that blood was "gurgling everywhere." This information was conveyed to Smith, but Smith was not convinced that Baker was dead. He said that Kyler's report that Baker had shot himself in the head did not provide a "sufficient degree of certainty" regarding that fact. The ERT proceeded on the assumption that Baker was not dead.

Although Smith was the Incident Commander, ERT Commander Michael Creswell was the person in overall charge of the situation at the Tanner home. At 4:35 a.m., Creswell ordered the five-man ERT entry team to go into the Tanner home and secure it. The team rescued Kirk Tanner, who was airlifted to a hospital. All of the Tanners survived their gunshot wounds, but both Cindy and Keith Baker died in the Tanner home.

## B.    Procedural background

In their Second Amended Complaint filed in the Lenawee County Circuit Court in February of 2003, the Tanners alleged four causes of action: (1) that the individual defendants (Adams, Hunt, Richardson, and Smith) were both negligent and grossly negligent in a way that caused the Tanners damages, (2) that all of the defendants violated the Tanners' rights under the Michigan Constitution to security and protection by the state, (3) that the individual defendants violated the Tanners' substantive due process rights under the United States Constitution, and (4) that the Lenawee County Sheriff's Department and Lenawee County violated the Tanners' federal substantive due process rights by (a) having in place policies and procedures that provided them with inadequate protection, and (b) by failing to enact policies that would have provided the family with more protection.

The defendants removed the case to the United States District Court for the Eastern District of Michigan. Shortly thereafter, the district court remanded the Tanners' state-law claims back to the Lenawee County Circuit Court, leaving only the two federal constitutional claims pending in the district court. The Lenawee County Sheriff's Department was then dismissed on the stipulation of the parties because it is not a legal entity capable of being sued.

In August of 2004, after extensive discovery, the defendants filed a joint motion for summary judgment. The motion alleged that there were no genuine issues of material fact, and that the defendants were entitled to a judgment as a matter of law under Rule 56(c) of the Federal Rules of Civil Procedure. After concluding that the defendants did not owe the Tanners any duty to protect or rescue, the district court entered a summary judgment in favor of the defendants.

## II.   ANALYSIS

### A.   Standard of review

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.   The Tanners' claims as to Adams and Hunt

To succeed on their claim brought pursuant to 42 U.S.C. § 1983 against Officers Adams and Hunt, the Tanners must show that "(1) a person, (2) acting under color of state law, (3) deprived [them] of a federal right." *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir. 2001). The only element at issue in this case is the third—whether the Tanners have shown that Adams and Hunt violated the family's substantive due process rights as guaranteed by the Fourteenth Amendment.

In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 197 (1989), the Supreme Court held that "[a]s a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." There is an exception to this rule, however, when the plaintiff can demonstrate "1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; 2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and 3) the state knew or should have known that its actions specifically endangered the plaintiff." *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). The Tanners rely on this "state-created-danger exception" in an attempt to show that their substantive due process rights were violated.

According to the Tanners, Officers Adams and Hunt increased the danger to the family in three ways: by "(1) responding to the 911 call; (2) making their presence known to Baker when they blocked him in the Tanners' driveway and pursued him up the driveway; and (3) t[aking] no further action by remaining in their vehicle as Baker walked towards the Tanner home with a loaded gun in sight." Whether the officers in fact took no further action to protect the Tanners is far from clear. As set forth above, there are several conflicting sources of evidence on this point. The district court concluded that the officers did yell at Baker and pursued him on foot. In their brief, the Tanners contend that the district court erred in making these factual determinations as to what actions Adams and Hunt took after pulling into the driveway. They argue on appeal that Adams and Hunt "inexplicably simply sat and watched" as Baker approached the house with a loaded gun.

Although there appears to be a genuine dispute as to whether Adams and Hunt "simply sat and watched" or whether they yelled at Baker and pursued him on foot, a closer examination reveals that the question is not material to the resolution of this case. *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). Even under the Tanners' version of the facts, we are of the opinion that they have failed to satisfy the requirements of the state-created-danger exception.

According to the Tanners' version of the facts—that Adams and Hunt "simply sat and watched" as Baker approached the house—the only "affirmative acts" that the officers performed were responding to the 911 call and driving up the driveway. *See Cartwright*, 336 F.3d at 493 (holding that only affirmative acts of government officials can give rise to liability under the state-created-danger exception). These acts allegedly trapped Baker in the driveway when he was otherwise leaving, causing the Tanners to argue that the officers increased the risk that Baker would harm the family.

The Tanners' argument fails for two reasons. First, the state-created-danger exception has never been extended to cover situations where the police simply respond to the scene of a 911 call (including pulling into the driveway). Adams and Hunt were dispatched to the Tanner home because the Tanners called 911 and were in need of police assistance. In attempting to protect the family, the officers drove to the scene and entered the driveway as soon as they identified the correct address. From a policy perspective, imposing liability on the officers for acting in this manner would dissuade the police from responding expeditiously to 911 calls.

The Tanners, however, cite the unpublished decision of *May v. Franklin County Board of Commissioners*, 59 Fed. App'x 786 (6th Cir. 2003), for the proposition that responding to a 911 call can give rise to a duty to protect the caller. In *May*, three separate 911 calls were placed by Deborah Kirk ("Deborah") from her apartment. *Id.* at 788. The 911 operator heard screaming and crying before two of the calls were terminated by some action at the apartment. *Id.* Two officers responded to the scene, knocked on the apartment door, and looked in the windows. *Id.* Because they got no response from within and could not see or hear any activity inside, they left. *Id.* At the time the officers were at the scene, Deborah was being restrained by her ex-boyfriend, who beat her to death later that night. *Id.* at 789. This court accepted the plaintiff's allegation that the officers' actions "emboldened" the attacker because he had a diminished fear of arrest, and that a duty to protect was therefore owed to Deborah. *Id.* at 793. (The motion to dismiss was brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, requiring the court to accept the allegations as true).

We decline to apply *May* to the present case. To start with, the decision is unpublished and is therefore not binding. More importantly, the opinion in *May* does not reflect any allegations or evidence that the officers knew or should have known that their actions specifically endangered Deborah, a requirement needed to satisfy the state-created-danger exception. *See Cartwright*, 336 F.3d at 493 (setting forth the three-element test). The plaintiff's allegation in *May* that the officer's actions emboldened the attacker is thus insufficient as a matter of law to satisfy the state-created-danger exception.

*May* is also distinguishable because the decision was before the court on a Rule 12(b)(6) motion to dismiss, as opposed to a motion for summary judgment. The *May* court had to accept the plaintiff's allegation that the actions of the officers emboldened Deborah's attacker. In contrast, the present case is before us in response to the Tanners' appeal from a grant of summary judgment, and the applicable standard of review does not require that we simply accept the Tanners' allegations. The Tanners claim in their brief that the actions of the officers "emboldened" Baker—"[T]he Appellees' affirmative acts instilled into Baker the belief that he could do whatever he wanted, and that the police could not and/or would not intervene . . . [and the belief] that he was not going to get away, and it was 'now or never.'" But the Tanners have not presented any evidence to substantiate these allegations, and therefore have failed to create a genuine issue of material fact regarding their emboldenment claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.") (quotation marks omitted).

The second reason that the officers are not liable under the state-created-danger exception is because the Tanners have not created a genuine issue of material fact as to whether Adams and Hunt "knew or should have known that [their] actions specifically endangered" the Tanners. *Cartwright*, 336 F.3d at 493. Nothing in the record establishes that the officers knew that the person backing down the driveway was Baker. In fact, Deanna herself—the 911 caller—did not know who was in the vehicle, as evidenced by her statement to the operator that the driver was her husband Kirk and not Baker. There is also no evidence that the officers knew that simply pulling into the driveway (what the Tanners call "blocking" Baker in) would cause Baker to draw a weapon, even if they did know that Baker was in the vehicle. Furthermore, even if the officers did know that Baker was in the vehicle and that pulling in behind him would prompt him to exit the vehicle with a weapon, there is no evidence that the officers knew that Baker would rampage through the Tanner home on a shooting spree, as opposed to shooting at the officers or fleeing on foot.

Any "genuine issue of fact" that remains is not material and does not preclude summary judgment. *See Anderson*, 477 U.S. at 248 (holding that only disputes that affect the outcome are material). We therefore conclude that Adams and Hunt are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## C.    The Tanners' claims as to Richardson and Smith

According to the Tanners, Sheriff Richardson and ERT Incident Commander Smith violated an ongoing duty to protect the family when they set up a perimeter around the house, which allegedly restrained Kirk's freedom to act on his own behalf and cut off a potentially lifesaving rescue, either by emergency medical personnel or anyone else. The Tanners attempt to draw an analogy between setting up a perimeter around their house and cases in which the government has restrained an individual through "incarceration, institutionalization, or other similar restraint of personal liberty." We find no merit in this argument.

Setting up a perimeter around the Tanner house did not restrain Kirk's liberty or prevent him from acting on his own behalf. *See DeShaney*, 489 U.S. at 200 ("[T]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."). The actions of Kirk's wife and three children adequately demonstrate the lack of restraint—they all fled the home on foot after the police had effectively set up a perimeter.

In addition to arguing that Richardson and Smith prevented Kirk from acting on his own behalf, the Tanners contend that the officers' actions prevented emergency medical personnel from rescuing Kirk. This claim was properly rejected by the district court because there is no constitutional right to state-provided rescue services, so there was no constitutional violation in preventing publically employed medical personnel from entering the home to care for Kirk. *DeShaney*, 489 U.S. at 196 ("[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.").

Finally, the Tanners rely on the unpublished opinion of this court in *Beck v. Haik*, No. 99-1050, 2000 WL 1597942 (6th Cir. Oct. 17, 2000), for the proposition that preventing a private rescue can establish § 1983 liability. In *Beck*, two men jumped or fell into the Manistee River in Michigan. Emergency personnel from the county arrived on the scene after receiving a 911 call from a witness. *Id.* at *1. One of the men in the river swam to shore, but the officers saw the other man go under and not resurface. *Id.* Two trained civilian rescue divers heard a report of the incident on their police scanner and drove to the scene. *Id.* They told the officer in charge that they were prepared to attempt a rescue. *Id.* But the officer told the divers that the government dive team had been summoned and for them not to enter the water, even though the officer knew that the civilian divers

were qualified to perform such a rescue dive. *Id*. Thirty-five minutes later, the government dive team arrived and recovered the body of the man shortly thereafter. *Id*. at *2. The deceased man's estate sued the county and several officials.

On appeal, this court held that there is "no constitutional right to state-provided rescue services," so the county did not violate any constitutional rights by having in place a policy whereby any underwater rescues by the government dive team must be authorized—and therefore possibly delayed—by the Sheriff. *Id*. at *3. But the plaintiffs also argued that the county officials irrationally prohibited private rescue efforts as well. *Id*. This court held that this private-rescue claim "might prove to be meritorious . . . depending on how a jury ultimately assesses the evidence." *Id*.

The present case is a far cry from the facts in *Beck*. Here, there was no comparable private rescuer on hand who was prevented from entering the house to aid Kirk. Furthermore, any claim that the rest of the Tanner family or a passerby *could* have helped Kirk but for the actions of Richardson and Smith fails because the officers would not have been aware of the would-be rescuer's qualifications. *See Hermann v. Cook*, 114 Fed. App'x 162, 166 (6th Cir. 2004) (unpublished) (calling *Beck* "factually distinguishable" because, in that case, "the police knew that the volunteer divers were trained civilian divers," but in *Hermann* "the officers knew nothing of [the attempted rescuer's] purported qualifications," and therefore concluding that the officers did not violate the victim's constitutional rights by disallowing a private-rescue attempt by one concert goer where another concert goer, after being arrested, ran and dove into the Ohio river and ultimately drowned).

The evidence further demonstrates that even if the perimeter around the Tanner house prevented some hypothetical private rescue attempt, Richardson and Smith were not the officials who were directly responsible. After his arrival on the scene, Sheriff Richardson ceded command to Smith because the ERT had been dispatched and Smith was the Incident Commander at the time. But even Smith was not the final decision-maker that evening. Rather, Smith reported to ERT Commander Creswell. Creswell is the individual who was ultimately responsible for the conduct of the ERT and who decided when to deploy the entry team into the Tanner home.

In summary, Richardson and Smith did not violate the Tanners' constitutional rights by setting up a perimeter. These officers did not restrain Kirk's ability to act on his own behalf, restrain his liberty, or prevent any private rescue. We therefore conclude that Richardson and Smith are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

**D.    The Tanners' claims against Lenawee County**

Because none of the individual officers violated the Tanners constitutional rights, the claims against Lenawee County necessarily fail as a matter of law. *See Scott v. Clay County*, 205 F.3d 867, 879 (6th Cir. 2000) ("[O]ur conclusion that no officer-defendant had deprived the plaintiff of any constitutional right a fortiori defeats the claim against the County as well.").

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.