**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 10a0005n.06**

**No. 08-2100**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Jan 05, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| **FRANK D. WILLIS**, et al., | ) | |
| | ) | |
| *Plaintiffs-Appellants,* | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| **CHARTER TOWNSHIP OF EMMETT**, named as | ) | COURT FOR THE WESTERN |
| Emmett Township, et al., | ) | DISTRICT OF MICHIGAN |
| | ) | |
| *Defendants-Appellees.* | ) | **O P I N I O N** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

BEFORE:    RYAN, COLE, and CLAY, Circuit Judges.

**COLE, Circuit Judge.**  Frank Willis and Michael Willis  (the "Willises"), co-personal representatives of the estate of Christopher Willis, brought this suit against the Charter Township of Emmett and a number of other defendants involved in the emergency response to the automobile accident that resulted in Christopher Willis's death.  The Willises appeal from a grant of summary judgment on their Fourteenth Amendment claim based on the failure of the emergency responders to recognize that Christopher Willis was still alive and provide him with the medical care he needed.  For the following reasons, we **AFFIRM** the district court's grant of summary judgment.

## I. BACKGROUND

The tragic car accident that gave rise to this case occurred during the early hours of July 18, 2003. At approximately 6:30 a.m., Christopher Willis ("Christopher") was driving his Ford Ranger pickup truck eastbound on Interstate 94 in Michigan when he lost control of the vehicle, crossed the median, and became airborne. Christopher's pickup collided with a semi-truck and flew over the top of a Pontiac Grand Prix traveling in the westbound lanes of the highway. As a result of the crash, parts of the cab of Christopher's pickup were separated from its frame, the semi-truck was jack-knifed into the median, and the dented Grand Prix skidded to the shoulder of the highway.

Michael Reed, one of several bystanders who stopped to help those involved in the accident, approached the cab of the pickup, which had landed upside down, and saw Christopher's arm dangling through the window. Although Reed could not find a pulse on Christopher's arm, he crawled partway into the cab and noticed that Christopher was still breathing.

Logan Bishop, who worked both as a firefighter and a police officer for the Township, was one of the first officials to respond to the accident. According to Bishop, when he approached Christopher's pickup, he quickly was advised by two bystanders that the driver had no pulse. Reed claims he told Bishop that Christopher was still alive and breathing, but Bishop denies this claim. In any case, Bishop concluded that Christopher had not survived the accident based on his understanding that Christopher did not have a pulse in his arm and the extent of the damage to the pickup. Accordingly, he focused his attention on the other accident victims. He also told another police officer, Lance Barbre, that Christopher was dead. Relying on this information, Barbre called the emergency dispatch team and informed them that there was a "Signal 15" at the scene of the

accident—the town's signal for a fatality. Subsequent responders heard the report of a Signal 15 en route to the accident scene. When paramedics arrived, Barbre specifically instructed them not to go to Christopher's pickup because the driver was dead and instead told them to treat the other victims.

Scott Counts, a Township firefighter, was another of the first responders to arrive at the scene. When Counts approached Christopher's truck, he also was informed by two bystanders that a pulse could not be found on Christopher's arm. Counts tried to locate a pulse on Christopher's arm himself, but was unsuccessful. When he attempted to gain access to Christopher through the window of the cab, he could not fit, but saw that Christopher's lower body was badly mangled. Counts informed two paramedics and another firefighter that he was unable to find Christopher's pulse. Counts claims that he never expressly told the paramedics that Christopher was dead and that neither Reed nor anyone else at the scene ever informed him that Christopher was still breathing. The paramedics he spoke with moved on to assist the injured occupants of the Grand Prix.

Based at least partially on Bishop's and Counts's statements, everyone arriving at the scene assumed that Christopher was dead. The paramedics placed a white sheet over Christopher's truck and called an emergency-room physician who pronounced Christopher dead over the phone at approximately 7:00 a.m. Christopher was left alone in the pickup cab for over two hours as investigators photographed the scene and gathered evidence. At around 8:46 a.m., the sheet was removed and the cab was secured to a tow truck so that the responders could extricate Christopher's body from the wreckage. Before this process was complete, someone from the medical examiner's office who was able to enter the cab discovered that Christopher was still breathing. An emergency

helicopter immediately was called to the scene to transport Christopher to a hospital. Christopher was pronounced dead at Borgess Hospital in Kalamazoo, Michigan, at 9:52 a.m.

On July 15, 2005, the Willises filed a complaint in Michigan state court against Bishop, Logan, and the Township, among others, alleging violations of Christopher's Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983 and state tort laws. On August 17, 2005, the case was removed to federal district court on the basis of federal question jurisdiction. After dismissing the Willises' claims against the other defendants, the district court granted summary judgment to Bishop, Counts, and the Township on July 24, 2008. A judgment was entered dismissing the Willises' constitutional claims and remanding their gross negligence claim to state court. The Willises timely appealed the dismissal of their Fourteenth Amendment claims. We have jurisdiction under 28 U.S.C. § 1291 of the Willises' appeal from a final order of the district court.

## II. ANALYSIS

### A. Standard of Review

This Court reviews de novo a district court's order granting summary judgment. *Sullivan v. Or. Ford, Inc.*, 559 F.3d 594, 594 (6th Cir. 2009). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing the district court's decision to grant summary judgment, this Court must view all evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B. Due process claim**

**1. DeShaney *and its exceptions***

The threshold issue on appeal is whether Bishop and Counts violated Christopher's Fourteenth Amendment rights by failing to provide Christopher with medical care and spreading the false information that he was dead, causing the other emergency responders not to treat him. The Due Process Clause generally does not impose affirmative duties on the state to protect or aid individuals. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 196-97 (1989). However, this Court has recognized two exceptions to this rule: (1) the "custody" or "special-relationship" exception, and (2) the "state-created danger" exception. *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998). Here, the district court correctly ruled that neither exception applied and, therefore, that the defendants were entitled to summary judgment.

(a) *The custody exception does not apply*

The custody exception to the *DeShaney* rule "triggers a constitutional duty to provide adequate medical care to incarcerated prisoners, those involuntarily committed to mental institutions, foster children, pre-trial detainees, and those under 'other similar restraint of personal liberty.'" *Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005) (quoting *DeShaney*, 489 U.S. at 200). This Court has explained that the custody exception requires "an affirmative act by the state that restrains the ability of an individual to act on his own behalf." *Id.* (citing *Stemler v. City of Florence*, 126 F.3d 856, 868 (6th Cir. 1997)); *see also DeShaney*, 489 U.S. at 199-200 ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."). When

the inquiry involves alleged custody of an unconscious victim, we require a further showing of "'some state action that applies force (or the threat of force) and show of authority made with the intent of acquiring physical control.'" *Carver v. City of Cincinnati*, 474 F.3d 283, 286 (6th Cir. 2007) (quoting *Jackson*, 429 F.3d at 590) (noting that "[a]n example would be an unconscious drunk whom the police handcuff and take to jail"). Where such a showing is not made, the custody exception is inapplicable. *See, e.g.*, *Jackson*, 429 F.3d at 590-91 (holding that moving an unconscious patient into an ambulance does not constitute taking him into custody).

The custody exception does not apply in this case because Christopher was restrained by the circumstances of the car accident, not by the defendants' actions. The Willises argue that by not treating Christopher and by leading others not to treat him, Bishop and Counts affirmatively acted in a manner that restrained Christopher's ability to regain consciousness and receive the help he needed. This argument is unavailing. Bishop and Counts did not use force or the threat of force when they informed others that Christopher did not survive the accident nor did they demonstrate any intent to exercise control over Christopher, as would be required to satisfy the custody exception. Most importantly, none of their actions restrained Christopher's personal liberty—he was restrained by the unfortunate circumstances of the car accident. *See Carver*, 474 F.3d at 286 (finding that custody exception did not apply where emergency responders left a man lying unconscious in a room that had been secured as a crime scene, and from which they already had removed a person who apparently had died of a drug overdose); *Jackson*, 429 F.3d at 590-91 (finding that custody exception did not apply where gunshot victim was moved from crime scene into an ambulance where he died without being taken to a trauma center or given life support).

The Willises contend that the custody exception applies because the defendants "knew of" Christopher's predicament. This argument is misguided. First, there is no indication that Bishop or Counts knew Christopher was still alive—they erroneously assumed that he was dead and redirected their efforts to the other victims because they thought Christopher was beyond assistance. Moreover, even if they had known that Christopher was alive, the custody exception would not apply because they did nothing to restrain him. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200.

(b) *The state-created danger exception does not apply*

The Willises also argue that their claim falls under the state-created danger exception, which applies when the state exposes an individual to private acts of violence by either creating danger or causing the individual to be more vulnerable to danger. *See Kallstrom*, 136 F.3d at 1066. Under this exception, a state actor can be held responsible for an injury committed by a private person if: (1) the state actor affirmatively acted to create or increase the risk of injury; (2) the victim, or a small class including the victim, was especially endangered; and (3) the state actor had the requisite degree of culpability. *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008) (citing *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 464 (6th Cir. 2006)); *see Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002) ("[S]tate officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way."). The state-created danger exception is inapplicable here because

- 7 -

Bishop and Counts did not affirmatively act to expose Christopher to private acts of violence nor did they have the requisite degree of culpability.

The conduct by Bishop and Counts does not meet the first element of a state-created danger claim because neither acted affirmatively to deny Christopher care and because their actions did not expose Christopher to private acts of violence. This Court repeatedly has held that a failure to act cannot be considered an affirmative act under the state-created danger theory. *See Jones v. Reynolds*, 438 F.3d 685, 691-92 (6th Cir. 2006) (the failure of police to stop a fatal drag race, when they arrived on the scene before it started, was not an affirmative act); *Weeks v. Portage County Executive Offices*, 235 F.3d 275, 279 (6th Cir. 2000) (failing to call an ambulance for a man bleeding from a gash on his forehead and instead ordering him to leave the scene of a traffic stop was not an affirmative act); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir. 1995) (failure to take home immediately a student known to suffer from seizures when she collapsed on a school bus was not an affirmative act). However, we also have noted the difficulty of distinguishing between an affirmative act and a failure to act. Accordingly, "[r]ather than focusing on the often metaphysical question of whether officer behavior amounts to affirmative conduct or not, we have focused on 'whether [the victim] was safer before the state action than he was after it.'" *Koulta v. Merciez*, 477 F.3d 442, 445-46 (6th Cir. 2007) (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)) (second alteration in original). Here, the conduct of Bishop and Counts falls neatly into the "failure to act" category—they failed to discover that Christopher was still alive and thus did not provide him with the medical care he needed. Even assuming that their conduct blurred the line between affirmative acts and the failure to act, the Willises cannot satisfy this prong of the test

because Bishop and Counts did not make Christopher less safe by increasing the risk that he would be exposed to private acts of violence.

The Willises argue that the extended period of time during which Christopher was left untreated and the jostling of the cab of his pickup when it was secured for towing satisfy the private acts of violence requirement. However, neither of these circumstances amount to private acts of violence. In *Jackson*, we held that the state-created danger exception did not apply when emergency personnel moved a gunshot victim from the bar where he had been shot to the back of an ambulance, where he died before receiving medical treatment. *Jackson*, 429 F.3d at 591. Specifically, we rejected the argument that moving the decedent to a location where it was less likely that he would receive aid constituted exposing him to private acts of violence. *Id.*; *see also Peete v. Metro. Gov't of Nashville & Davidson County*, 486 F.3d 217, 223 (6th Cir. 2007) (holding that seizure victim was not exposed to private acts of violence when emergency personnel restrained him without leaving a clear passage for him to breathe). Likewise, Bishop and Counts did not expose Christopher to private acts of violence by making it less likely that he would receive treatment or delaying the treatment he eventually received. Christopher's injuries were caused by the car accident that occurred prior to their arrival. Although it seems certain that his condition deteriorated during the two hours he was left untreated, Bishop and Counts did not carry out any affirmative acts that increased the risk that Christopher would be exposed to private acts of violence.

Because the Willises have not met the first prong of the state-created danger analysis, "it is unnecessary to consider the second and third prongs." *Jackson*, 429 F.3d at 591. However, we note that even if the first two requirements were met, the Willises' claim would fail because Bishop and

Counts did not have the requisite degree of culpability. To satisfy this requirement, "[t]he government's conduct must be so egregious that it can be said to be arbitrary in the constitutional sense." *McQueen*, 433 F.3d at 469 (internal quotations omitted). We have explained that "a deliberate-indifference standard is appropriate in 'settings [that] provide the opportunity for reflection and unhurried judgments,' but that a higher bar may be necessary when opportunities for reasoned deliberation are not present." *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003) (quoting *Ewolski*, 287 F.3d at 511 n.5); *see Hunt*, 542 F.3d at 541. We also have explained that, even in non-emergency situations, "we . . . must make some assessment that [the state actor] did not act in furtherance of a countervailing governmental purpose that justified" exposing the victim to danger. *Hunt*, 542 F.3d at 541.

When Bishop and Counts arrived at the scene and initially decided not to investigate Christopher's condition further, they were in an emergency situation that did not lend itself to reflection or unhurried judgments. However, viewing the evidence in the light most favorable to the Willises, the amount of time that passed before Christopher was discovered breathing and the relative lack of urgency of the other victims' injuries suggests that, though their initial evaluations were hurried justifiably, Bishop and Counts subsequently had time to reflect on their decisions. Therefore, the less onerous deliberate-indifference standard is appropriate.

However, even under the deliberate-indifference standard, Bishop and Counts did not have the requisite degree of culpability. "We have equated deliberate indifference with subjective recklessness, which means that the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*McQueen*, 433 F.3d at 469 (internal citation and quotations omitted). The Willises have pointed to nothing that suggests that Bishop and Counts actually drew the inference that Christopher was still alive and in need of immediate medical attention. Nor was the risk that Christopher was still living "so obvious" that Bishop and Counts "had to have known about it." *Id.* With the benefit of hindsight, it is clear that Bishop and Counts should have more thoroughly evaluated Christopher's condition, but they did not act with deliberate indifference in failing to do so. *See Arledge v. Franklin County, Ohio*, 509 F.3d 258, 263-64 (6th Cir. 2007) (noting that although in hindsight there were clear indications that juvenile victim would be at risk if placed in home where he subsequently was shot and killed, the risk was not so obvious that defendants were deliberately indifferent in disregarding it). Moreover, any risk that Bishop and Counts exposed Christopher to must be balanced against the state's interest in having them carry out their other duties in responding to the accident. *See Ewolski*, 287 F.3d at 513-16 (holding that police officer did not act with deliberate indifference when he chose one risky course of action in a hostage situation over another risky course of action). Any culpability on the part of Bishop and Counts is diminished by the fact that they were responding to the scene of a multi-vehicle traffic accident, where they had to evaluate competing interests and determine where their efforts would be most useful.

### 2. *Thwarting private rescue*

Finally, the Willises contend that even if their due process claim fails under the *DeShaney* exceptions, it should survive summary judgment because Bishop and Counts arbitrarily thwarted potential attempts by private parties to rescue Christopher. Relying on *Beck v. Haik*, 234 F.3d 1267, 2000 WL 1597942 (6th Cir. 2000) (unpublished table decision), the Willises argue that Christopher

had a constitutional right to unfettered private rescue that Bishop and Counts violated. This argument also is unavailing.

In *Beck*, local officials prohibited a qualified, private dive team from trying to rescue a man who jumped or fell into a river and instead waited thirty-five minutes for the county's dive team to arrive. *Id.* at *1-*2. When the county dive team found the man, he was already dead. *Id.* at *2. Resuscitation attempts failed, but there were indications that had his body been recovered sooner, the attempts may have been successful. *Id.* We reversed the district court's grant of summary judgment against the plaintiffs on the claim that the man's due process rights were violated when the state arbitrarily prohibited private rescue attempts without providing a meaningful alternative and remanded for further proceedings because the "claim might prove to be meritorious." *Id.* at *3.

Despite the Willises' efforts to recharacterize their claim as one in which Bishop and Counts prevented a private rescue of Christopher, the essence of their claim is that the defendants should be liable for not rescuing Christopher sooner. They have put forth no evidence to show that Bishop or Counts arbitrarily prevented any private individual from attempting to help Christopher. Further, because everyone at the scene was under the impression that Christopher was dead, no private rescue attempts were made. Accordingly, the Willises do not have a due process claim under *Beck*. *See Tanner v. County of Lenawee*, 452 F.3d 472, 481 (6th Cir. 2006) (distinguishing *Beck* because there was no qualified, private rescuer on hand); *Hermann v. Cook*, 114 F. App'x 162, 166 (6th Cir. 2004) (distinguishing *Beck* because the private rescuer was not a qualified diver).

**C. Qualified immunity and municipal liability**

Because Christopher's constitutional rights were not violated, the district court was correct in holding that Bishop and Counts were entitled to qualified immunity. *See Cartwright*, 336 F.3d at 493-94. Similarly, because Bishop and Counts did not commit a constitutional violation, the Township cannot be held liable for their conduct. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that municipality could not be held liable because the plaintiff did not suffer a constitutional injury at the hands of municipal employees).

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment.