NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0137n.06

Case No. 16-6027

**FILED**
Mar 03, 2017
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ESTATE OF DUSTIN BARNWELL BY NEXT OF KIN S.C.B., A MINOR, BY NEXT FRIEND SHASTA LASHAY GILMORE, | ) ) ) ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| v. | ) ) | |
| MITCH GRIGSBY; RICHARD STOOKSBURY; DAVID RANDLE; ROBERT COOKER, in their individual and official capacities, | ) ) ) ) ) | |
| Defendants-Appellants. | ) ) | |

BEFORE: COLE, Chief Judge; COOK and WHITE, Circuit Judges.

COOK, Circuit Judge. After taking eight prescription muscle relaxant pills, Dustin Barnwell lost consciousness for several hours. In the course of attending to Barnwell, police officers and paramedics administered succinylcholine, a drug that paralyzes the body, including the muscles used to breathe. After a failed intubation attempt, Barnwell died. His estate sued the officers and paramedics, alleging that administering succinylcholine constituted excessive force, among other legal claims.

The parties dispute a number of facts surrounding Barnwell's death. Finding those disputes genuine, the district court denied qualified immunity to the officers and paramedics on

the excessive-force claim. It also denied qualified immunity on a "state-created-danger" theory of liability. The defendants appealed. Because the defendants' arguments for qualified immunity on the excessive-force claim rely on their own disputed version of the facts, we DISMISS that portion of their appeal for lack of jurisdiction. But since the district court erred as a matter of law in applying the state-created-danger doctrine, we REVERSE the district court on that aspect of its ruling. We REMAND for further proceedings consistent with this opinion.

## I.

### A. Factual Background

On November 11, 2011, Barnwell, his fiancée Shasta Lashay Gilmore, and their daughter, S.C.B., left their home to go to Walmart. On the way, Barnwell insisted that they visit his friend, Aaron Sweat, so that he could get several pills of Flexeril, a prescription muscle relaxant. The family arrived at Sweat's house at around 4:30 or 5:00 p.m., and Sweat gave Barnwell eight Flexeril pills. The family then proceeded to Walmart, where Barnwell started feeling ill. Once they returned home, he began "walking unstead[ily]" before collapsing onto their loveseat and passing out. When Gilmore directed S.C.B. to wake her father, he stirred, vomited, and fell back asleep.

By around 8:00 p.m., Barnwell still had not awakened. Concerned that he overdosed, Gilmore called 9-1-1. She told the operator that Barnwell had consumed eight Flexeril pills, and she requested an ambulance. She also said that when she tried to get him up off the couch, he kept "wanting to fight" with her and was "very combat[ive]." During her deposition, Gilmore explained that "[w]henever [she] pulled his legs off the couch to see if [she] could get a response, he just pulled them back really fast." She surmised that she "miscommunicated" Barnwell's combativeness to the 9-1-1 operator because her fiancé was not "swinging [at] or biting" her.

Officer Mitch Grigsby and Sergeant Richard Stooksbury of the Roane County Sheriff's Department arrived at Barnwell's residence before the paramedics. They discovered Barnwell lying unconscious on the loveseat. Gilmore advised them that Barnwell had taken eight Flexeril pills, and she warned them that he was combative.

The parties dispute what happened next.

Sergeant Stooksbury attested that when he tried to wake Barnwell by shaking his foot, the man "arose and immediately became combative by kicking." In response, the officers grabbed his arms to hold him down. Despite the two officers' efforts, however, Barnwell kicked and tried to bite them. The officers also attested that he went in and out of consciousness. Because Barnwell was too difficult to control, the officers took him to the ground and pinned him on the floor.

Around this time, Roane County EMS paramedic David Randle arrived. He observed Barnwell continuing to struggle with Sergeant Stooksbury and Officer Grigsby, and he asked the officers to handcuff Barnwell so that he could insert an IV line. The officers cuffed Barnwell.

Gilmore recalls these events differently. After they arrived, the officers were "rough with [Barnwell]," so much so that she asked them to "please stop before [they] kill him." She recalls that whenever her fiancé tried to sit up, they pushed him back down by his throat and slammed his legs down. She also remembers one of them grabbing Barnwell's arms and saying, "I'll break your damn arm." In her observation, her fiancé was not violently kicking or biting at the officers—in fact, he was mostly unconscious during this period. Eventually, they flipped him off the couch and had him lying on the floor, face-down. Gilmore testified that after the paramedics arrived, one of the officers "looked straight at [her] and said, 'We're about to knock him out.'"

The officers and paramedics were "talking." As Randle began to administer medicine through an IV line, one of the officers escorted her out of the house.

Meanwhile, paramedic Randle reports observing that Barnwell's heart rate was abnormally fast, his breathing irregular, and his blood pressure highly elevated. Randle called for a second paramedic unit. The second unit, including paramedic Robert Cooker, arrived shortly thereafter. Upon learning that Barnwell had likely consumed eight Flexeril pills, the paramedics concluded that he was overdosing and should be taken to a hospital as soon as possible. They also determined that, as a result of Barnwell's continued combativeness, they needed to administer medications to control his involuntary movements and assist with breathing and heart function.

They decided to initiate Roane County's Rapid Sequence Paralysis and Intubation Protocol (RSI Protocol). The "Assessments and Indications" call for using the protocol on patients who are "[s]everely combative" or patients for whom "[all] standard attempts to establish an airway have failed." To carry out the protocol, they administered succinylcholine, a muscle relaxant that paralyzes muscles in less than a minute, including those used to breathe. After achieving paralysis, Randle and Cooker intubated Barnwell—that is, placed a plastic tube in his trachea to open his airway. Unfortunately, however, Barnwell began suffering cardiac issues. While transporting Barnwell to the hospital, Cooker and Randle noticed brown fluid leaching into the intubation tube. They removed the tube and began CPR. Barnwell died at the hospital thirty minutes later.

According to the autopsy report, excited delirium syndrome (EDS) following a Flexeril overdose caused Barnwell's death. EDS is a rarely observed phenomenon ordinarily associated

with cocaine and methamphetamine consumption. Its symptoms include paranoia, disorientation, tachycardia, and hyper-aggression.

But Plaintiff's expert, Dr. Steven Perlaky, considers it highly unlikely that Flexeril caused Barnwell's death. After reviewing Barnwell's medical records and the EMS reports from the evening, Dr. Perlaky concluded that the "succinylcholine delivered to Mr. Barnwell was unnecessary" because Barnwell appeared to have been able to breathe on his own, as evidenced by his "engag[ing] in acts that required normal breathing" (i.e., kicking at the officers). In Dr. Perlaky's view, Barnwell "died because the medics did not reverse the consequences of their initial mistake, i.e., paralyzing the lungs of an ably breathing . . . man" and "they inserted the breathing tube improperly" into Barnwell's esophagus, not his trachea. In an affidavit he also stated that "[t]here [was] no rational theory in the health sciences for paralyzing the lungs in this situation." He concluded "within a reasonable degree of medical certainty that the choice to administer [succinylcholine] was made without any proper medical foundation."

## B. Procedural Background

In November 2012, Gilmore filed a complaint on behalf of Barnwell's estate and S.C.B., naming Officer Grigsby, Sergeant Stooksbury, paramedics Randle and Cooker, and Roane County, Tennessee as defendants. Relevant here, she pleaded 42 U.S.C. § 1983 claims, contending that the officers' and paramedics' (1) restraint of Barnwell and (2) administration of succinylcholine constituted excessive force. After discovery, the defendants filed a motion for summary judgment on the § 1983 claims. The individual defendants asserted qualified immunity.

The district court granted the motion in favor of Roane County. It also granted qualified immunity to the officers and paramedics on the unlawful restraint claim. The district court

reached a different conclusion, however, with respect to the officers' and paramedics' decision to administer succinylcholine. Gilmore had argued that giving Barnwell the drug constituted excessive force and that it amounted to a "state-created-danger." The district court determined that genuine disputes of fact precluded summary judgment to the defendant officers and paramedics under both theories. The officers and paramedics appealed.

## II.

The officers and paramedics assert they are entitled to qualified immunity for administering succinylcholine to Barnwell. Yet in doing so, they challenge the district court's determination that genuine factual disputes bar summary judgment in their favor. Ordinarily, appellate courts lack jurisdiction to consider interlocutory appeals involving fact-based challenges to a district court's denial of qualified immunity. *See Johnson v. Jones*, 515 U.S. 304, 319–20 (1995). As a result, we must assure ourselves that we possess jurisdiction to consider the defendants' arguments.

### A. Legal Standards

"Qualified immunity shields government officials from standing trial for civil liability in their performance of discretionary functions unless their actions violate clearly established rights." *Thompson v. City of Lebanon, Tenn.*, 831 F.3d 366, 369 (6th Cir. 2016) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). At the summary judgment stage, the plaintiff bears the burden of overcoming a qualified-immunity defense—that is, of showing a genuine issue of fact that the defendant violated a clearly established constitutional right. *Id.* (citations omitted). A district court must deny summary judgment if it "determines that the plaintiff's evidence would reasonably support a jury's finding that a defendant violated a clearly established right." *Id.* at 370 (quoting *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015)).

Although a summary judgment denial ordinarily does not qualify as a final (and thus appealable) decision within the meaning of 28 U.S.C. § 1291, "a district court's denial of a claim of qualified immunity, *to the extent that it turns on an issue of law*," falls within a limited category of immediately appealable collateral orders. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (emphasis added); *see also Johnson*, 515 U.S. at 311–12. "Yet when analyzing qualified immunity on interlocutory appeal, our jurisdiction is quite narrow." *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009).

Simply put, we "may review only 'purely' legal arguments." *McKenna v. City of Royal Oak* ("*McKenna I*"), 469 F.3d 559, 561 (6th Cir. 2006) (internal quotation mark omitted) (quoting *Estate of Bing v. Whitehall*, 456 F.3d 555, 563 (6th Cir. 2006)). As a result, the defendant officers and paramedics must concede Gilmore's version of events. *Baker v. Union Twp.*, 587 F. App'x 229, 232 (6th Cir. 2014). Further, we lack jurisdiction to review "inferences the district court draws from those facts." *Thompson*, 831 F.3d at 370 (citing *Romo v. Largen*, 723 F.3d 670, 673–74 (6th Cir. 2013)).

There is, however, one exception to the rule that appellate courts lack jurisdiction to resolve fact-based disputes. If the district court's factual determination is "blatantly contradicted by the record," *Scott v. Harris*, 550 U.S. 372, 380 (2007), we may consider the challenge. But "[t]his 'one limited exception'" applies "only 'where the evidence is so utterly discredited by the record as to be rendered a visible fiction.'" *Kollin v. City of Cleveland*, 557 F. App'x 396, 401 (6th Cir. 2014) (quoting *Younes v. Pellerito*, 739 F.3d 885, 889 (6th Cir. 2014)).

**B. The District Court's Denial of Qualified Immunity to the Officer Defendants on the Excessive Force Claim**

In moving for summary judgment, Officer Grigsby and Sergeant Stooksbury argued that their participation in administering succinylcholine was done in a medical capacity, not a law enforcement capacity, entitling them to qualified immunity under *Peete v. Metropolitan Government of Nashville & Davidson County*, 486 F.3d 217 (6th Cir. 2007). That case held that "where the purpose [of defendant emergency responders] is to render solicited aid in an emergency rather than to enforce the law, punish, deter, or incarcerate" there is no clearly established "constitutional liability" under the Fourth Amendment. *Id.* at 221.

The district court denied summary judgment on this ground, however, noting that, under Gilmore's version of the facts, a reasonable factfinder could conclude the defendants gave Barnwell the drug to punish him or, at best, control his unruly behavior, and the drug-induced paralysis was not based on any "patient-oriented rational theory of medicine." Given Gilmore's allegations, the district court left it to the jury to decide whether the officers acted in a medical or law enforcement capacity. In support, it cited *McKenna v. Edgell* ("*McKenna II*"), 617 F.3d 432, 441 (6th Cir. 2010), which elaborated upon *Peete* and held that, if in dispute, the "objective determination of the role that [emergency responders] played [in the alleged violation]"—whether they acted in a medical or law enforcement capacity—is "a jury question." *Id.*

On appeal, the officer defendants contest the summary judgment denial. But their arguments "rely on their own disputed version of the facts, not the facts as alleged by [Gilmore]." *McKenna I*, 469 F.3d at 561.

For instance, Officer Grigsby and Sergeant Stooksbury argue that they cannot be liable for administering succinylcholine because they played no role in giving Barnwell the drug. But the district court inferred the officers could have been involved in the decision. Challenging this

inference constitutes a "prohibited fact-based appeal." *Thompson*, 831 F.3d at 370. And to the extent Officer Grigsby and Sergeant Stooksbury assert that the record blatantly contradicts the inference, we disagree. Viewing the facts in the light most favorable to Gilmore, both officers restrained Barnwell as he came in and out of consciousness and convulsed on the floor. They conferred with the paramedics as the paramedics inserted an IV line. And one of the officers exclaimed, "We're about to knock him out," as the other ushered Gilmore out of the room. The inference that the officers were involved in the decision to "knock [Barnwell] out"—by paralyzing him with succinylcholine—is not "so utterly discredited by the record as to be rendered a visible fiction." *Kollin*, 557 F. App'x at 401 (quoting *Younes*, 739 F.3d at 889).

The officers also contend that the district court erred because it is "undisputed" they acted in a medical-responder capacity, not a law-enforcement capacity. But factual questions about their role pervade the record. The sequence of steps the officers took to restrain Barnwell suggests that their purpose was to control his combativeness rather than treat him. The officers' alleged aggressiveness in handling Barnwell could support the inference that they acted punitively in "knock[ing] [him] out." Absent facts rendering the district court's determination a "visible fiction," we lack jurisdiction to upend its decision. *Id*. (quoting *Younes*, 739 F.3d at 889).[1]

---

[1] The defendant officers also attack the district court's inferences about their punitive purpose by arguing that, in the Fourth Amendment context, "subjective intentions" do not matter. The officers misconstrue the appropriate inquiry. *Peete* requires an "objective determination" of a first responder's "purpose" or role when assessing whether the Fourth Amendment has application to their conduct. *McKenna II*, 617 F.3d at 440–41. Applying this framework, the district court concluded that the officers' purpose was in dispute. And objectively assessing the officers' conduct in the light most favorable to Gilmore, we conclude this inference is not "utterly discredited by the record" for the reasons explained. *Kollin*, 557 F. App'x at 401 (quoting *Younes*, 739 F.3d at 889).

Finally, the officers assert that, even if there is a question of fact about their role in administering succinylcholine, such conduct falls short of violating the Fourth Amendment. In support, they say that the relevant conduct was not giving Barnwell the drug per se, but merely assisting the EMS personnel in doing so. And in their view, they violated no clearly established rights in performing this function.

But this argument, too, relies on the officers' own disputed account of the facts. Viewing the record in the light most favorable to Gilmore, the officers did more than assist the paramedics in rendering aid. They decided to "knock [Barnwell] out" using a paralytic drug without medical necessity after already having restrained him facedown. If, as Gilmore alleges, the officers encouraged the paramedics to shut down Barnwell's respiratory function (i.e., apply deadly force) for punitive reasons, such actions would almost certainly cross the Fourth Amendment's "objective reasonableness" line. *See, e.g.*, *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901–05 (6th Cir. 2004) (concluding that officers' use of pepper spray and creation of asphyxiating conditions against an autistic man after they had already handcuffed and hobbled him was excessive and violated the man's clearly established Fourth Amendment rights); *c.f. Thompson*, 831 F.3d at 372 ("It is clearly established that using deadly force against a suspect who does not pose a threat to anyone and is not committing a crime or attempting to evade arrest violates the suspect's Fourth Amendment rights.").[2]

Because the officers' arguments rely on their own account of the events precipitating Barnwell's death, we dismiss this portion of the interlocutory appeal for lack of jurisdiction.

---

[2] Indeed, the defendant officers essentially concede as much elsewhere in their brief, noting it "likely true" that paralyzing an individual for punitive purposes "falls outside constitutionally permissible behavior."

**C. The District Court's Denial of Qualified Immunity to the Paramedic Defendants on the Excessive Force Claim**

Like the officer defendants, paramedics Randle and Cooker argued for qualified immunity at summary judgment based on *Peete*, asserting that they administered succinylcholine in their capacity as medical responders and that use of the paralytic drug was medically necessary. The district court, however, disagreed that the record undisputedly supported this contention. Noting Dr. Perlaky's statement that there was "no rational theory in the health sciences for paralyzing the lungs in [Mr. Barnwell's] situation," it concluded that a genuine dispute of fact barred it from granting them qualified immunity.

On appeal, the paramedics' arguments again rely on their contention that the RSI Protocol—including giving Barnwell succinylcholine—was medically necessary. They say it is undisputed that they followed the RSI Protocol "to the letter." And they further assert that, since Gilmore's expert, Dr. Perlaky, conceded that the RSI protocol is reasonable, their decision to use it must have been constitutional.

But these arguments, like the defendant officers', rely on a contested version of the facts. Despite the paramedics' representations, Gilmore proffered evidence undermining their contention that they followed the RSI Protocol "to the letter." For example, the paramedics argue that Barnwell's inability to breathe made use of the protocol appropriate. Yet Dr. Perlaky testified that, given the paramedics' own observations that Barnwell was combative, he doubted whether they could have reasonably concluded that Barnwell's airway was compromised. The paramedics also say they needed to administer succinylcholine because Barnwell was severely combative. Gilmore's deposition testimony, however, disputes this characterization of Barnwell's behavior.

And while it is true that Dr. Perlaky agreed the RSI Protocol "seem[ed] reasonable" as written, he did not opine that *its use on Barnwell* was reasonable. In fact, he stated "within a reasonable degree of certainty that the choice to administer [succinylcholine] was made without any proper medical foundation." The paramedics aim to poke holes in Dr. Perlaky's statements, calling them "stale" and "untested." But witness credibility determinations are the trier-of-fact's to make, and as a result, this argument constitutes exactly the type of contention we lack jurisdiction to consider on interlocutory appeal. The paramedics also assail Dr. Perlaky's medical conclusions in other ways, citing proposed testimony in expert disclosures from three different physicians. These expert disclosures, however, to the extent they impugn Dr. Perlaky's opinion, simply create more disputes of fact that lie outside our jurisdiction to review.

Given the paramedics' reliance on their own disputed version of the facts, we lack jurisdiction to opine on their qualified immunity defense for the excessive force claim.

## D. The State-Created-Danger Theory's Application to This Case

As noted, the district court also denied qualified immunity to the individual defendants under Gilmore's other asserted theory of liability: the state-created-danger doctrine. The defendants argue the doctrine is inapplicable to the types of harms Gilmore alleges. Because this argument avoids relying on the defendants' disputed version of the facts, we have jurisdiction to review this aspect of their appeal. *Thompson*, 831 F.3d at 370 (citing *DiLuzio*, 796 F.3d at 610) (noting that a court may "separate an appellant's reviewable challenges from the unreviewable"). Further, we agree with the defendants that the law forecloses any claim against them premised on a state-created-danger theory.

Governmental entities and officials have no general duty or "affirmative obligation" to protect citizens from private harm. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S.

189, 195 (1989). There are, however, two exceptions to this rule: the "custody" or special relationship exception, and the "state-created-danger" exception. *See Willis v. Charter Twp. of Emmett*, 360 F. App'x 596, 599 (6th Cir. 2010) (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998)). Only the latter is at issue here. The state-created-danger exception imposes liability on the government when it "exposes an individual to private acts of violence by either creating danger or causing an individual to be more vulnerable to danger." *Id.* at 600–01. As this court has explained,

> To establish liability under this theory, a plaintiff must show: (1) affirmative acts by the state that "create or increase the risk that an individual will be exposed to *private acts of violence*;" (2) that the state's actions placed the victim "specifically at risk, as distinguished from a risk that affects the public at large;" and (3) that the state knew or "clearly should have known that its actions specifically endangered an individual."

*Peete*, 486 F.3d at 223 (emphasis added) (quoting *Kallstrom*, 136 F.3d at 1066). Accordingly, to prevail on a claim under this doctrine, a plaintiff must show a governmental actor put the plaintiff at risk for an injury committed by a private person. *See Peete*, 486 F.3d at 223; *Willis*, 360 F. App'x at 601; *see also Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 921 (10th Cir. 2012); *Pena v. DePrisco*, 432 F.3d 98, 108–09 (2d Cir. 2005).

Here, Gilmore alleges that the defendants administered succinylcholine to penalize Barnwell, and that this drug caused his death. Thus, according to her, Barnwell suffered harm at the hands of government defendants—the officers and paramedics—*not* private actors, obviating the state-created-danger theory of liability. *See, e.g.*, *Peete*, 486 F.3d at 223 (paramedics who unintentionally asphyxiated man while restraining him during an epileptic seizure did not expose man to private acts of violence as required to state a viable claim under the state-created-danger theory).

We thus reverse this aspect of the district court's denial of summary judgment to the officer and paramedic defendants.

## III.

We DISMISS for lack of jurisdiction those portions of the defendants' appeal relating to Gilmore's excessive force claim. We REVERSE the district court's denial of summary judgment to the defendants on the state-created-danger theory and REMAND for proceedings consistent with this opinion.